[No. S004555. Crim. No. 23185. Dec. 28, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM ARNOLD PROCTOR, Defendant and Appellant.

500

508

510

512

**COUNSEL**

Edward L. Lascher and Wendy C. Lascher, under appointments by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Steve White, Chief Assistant Attorney General, J. Robert Jibson and William G. Prahl, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**GEORGE, J.**—Following the guilt phase of a jury trial held in Shasta County, defendant William Arnold Proctor was found guilty of various offenses committed against Mrs. Bonita Stendal: first degree murder (Pen. Code, §§ 187, 189),[1] forcible rape (§ 261, subd. (2)), and first degree burglary (§ 460). The jury also found that defendant inflicted great bodily injury (§ 12022.8), and found true the special circumstance allegations that he committed the murder in the course of rape (§ 190.2, subd. (a)(17)(iii)), in the course of first degree burglary (§ 190.2, subd. (a)(17)(vii)), and with the infliction of torture (§ 190.2, subd. (a)(18)). After the court declared a mistrial as to the penalty phase of the trial, defendant's motion for change of venue was granted as to that phase, and after further proceedings a jury in Sacramento County imposed the death penalty. After denying defendant's motion for modification of the verdict, the court sentenced defendant to death. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

FACTS

The evidence at trial established that on the evening of April 21, 1982, defendant entered the residence of Mrs. Bonita Stendal, a widow living alone, and sometime that evening or early the next morning, raped, tortured, and murdered her. Defendant then transported her body in the trunk of her automobile to a site near a lake 12 miles away, where he pushed the body off an embankment.

I. GUILT PHASE EVIDENCE

A. *The prosecution's case.*

1. *The crimes.*

Mrs. Bonita Stendal, 55 years of age, lived on Ponderosa Street in Burney, a small mountain community located 35 miles east of Redding in Shasta County. Mrs. Stendal taught first grade students at the East Burney Elementary School. The last person (other than defendant) to see her alive on the

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

evening of April 21, 1982, was a fellow schoolteacher, Robert Schmidt, who briefly spoke with her at the supermarket in Burney and then encountered her 10 minutes later at the nearby drugstore, approximately 7:50 p.m.

Later the same evening, Mrs. Stendal's neighbor, Patty Olinger, was seated in her automobile as it was being pushed through the intersection at Marquette and Ponderosa Streets, when she observed Mrs. Stendal's muddy vehicle parked in the driveway of Mrs. Stendal's residence on Ponderosa Street.[2] During the two-year period of their acquaintance, Olinger had known Mrs. Stendal always to park her vehicle inside her garage and never in the driveway, and had known her always to keep her vehicle clean. Olinger observed the lights on inside Mrs. Stendal's residence at this time.

Approximately 8:55 a.m. the following morning, Dena Humble, the secretary at Mrs. Stendal's school, was notified that Mrs. Stendal had failed to arrive. Upon telephoning Mrs. Stendal's residence and receiving no response, she telephoned Mrs. Stendal's next-door neighbor and teaching assistant, who informed Humble she did not know where Mrs. Stendal was. Humble then proceeded to Mrs. Stendal's residence, letting herself in the unlocked door and walking through the house when no one responded to her knock. Humble noticed a fork was on the kitchen counter, and the oven door was open. Inside the garage, Humble noticed a light was on and both of Mrs. Stendal's automobiles were inside. Returning to school, Humble notified the police.

Approximately 9:30 that morning, Sergeant Larry Jarrett of the Shasta County Sheriff's Department conducted a brief search of the Stendal residence. He observed that the house was very neat overall. There was an open pickle jar and carving fork on the kitchen counter, and a drawer containing carving forks and large knives was partly open. In the bedroom, the bed was covered only by a sheet.

Sergeant Jarrett departed to report to his superior, Lieutenant Phil Eoff, and shortly thereafter, accompanied by Sergeant Michael Shaeffer, an officer specializing in evidence and identification, they searched the residence more thoroughly. This time, the officers noticed that the telephone lines leading to the kitchen and den telephones had been severed, and the drapes in the den had been pulled off the hooks at one end. The officers also observed that one of the two vehicles in the garage was muddy, water was dripping from its fender wells, and there were wipe marks across the entire outside lid of its

---

[2]This witness testified she observed the vehicle in that condition and location, approximately 7:50 p.m. that evening. This reported time does not correlate with the testimony of other witnesses as to the relevant time periods.

trunk. After a locksmith opened the trunk, it was discovered that the items inside appeared to have been pushed into the outer edges of the trunk, and the dust inside recently had been disturbed.

At 4 p.m. that same day, April 22, 1982, newlyweds Robert and Susan Porter stopped their vehicle on the shoulder of the road near an embankment at Lake Britton, located 12 miles from Burney, in order to let out their dog and take a photograph of the scenery. When Robert Porter looked over the embankment, he discovered a body lying approximately 11 feet from the road. The couple telephoned law enforcement authorities and waited by the body for their arrival.

Sergeant Jarrett identified the body as that of Mrs. Stendal. It appeared to have been thrown from the roadway. Tire tracks of the same design as those made by the tires on Mrs. Stendal's automobile ran perpendicular to the road, and, from the tire tracks, drag marks led to the top of the embankment. The body was clad in a nightgown pulled up to the waist, and an unknotted scarf was draped around the neck. A green electric blanket covered the body. The hands were tied behind the victim's back with four sets of ligatures, made of cloth and nylons, by means of various types of "half-hitch" knots. There were some cuts and "damage" to the face.

On the morning of April 23, Sergeant Jarrett, accompanied by Shaeffer and several other experts, returned to Mrs. Stendal's house in order to take photographs and obtain fingerprints. Beneath an area rug on the bedroom floor, they discovered a small pool of blood, still damp, which proved to be the same type as Mrs. Stendal's blood. Other bloodstains were located on the knob of the bedroom dresser.

That same day, the authorities brought several longtime acquaintances of Mrs. Stendal into the residence. These individuals observed that a brown or beige purse she frequently used was missing, and that certain circumstances, such as the unlocked front door and missing bedspread and blanket, were unusual because Mrs. Stendal always locked the residence and kept it very neat.

On April 24, Dr. Boyd Stephens of the San Francisco City and County Coroner's office performed an autopsy on the body. He estimated that Mrs. Stendal had been killed sometime between the early evening hours of April 21 and the early morning hours of April 22. She was not killed at the location at which her body was found but had been transported there after death.

In Dr. Stephens's opinion, Mrs. Stendal's death was caused by asphyxiation, initiated by nonfatal manual strangulation and later by ligature strangulation. The face had suffered numerous cuts and bruises from a blunt

force. The eyes were swollen shut and the nose and lips also were swollen. Dr. Stephens believed that most of these injuries resulted from seven to nine blows. There were various internal injuries in the area of the neck. There were a number of shallow stab wounds and incisions caused by dragging a weapon across the skin in the area of the neck. The curvature of some of the injuries indicated they had been inflicted slowly and deliberately. There were seven wounds less than two inches deep to the area of the right breast which had been inflicted while Mrs. Stendal still was alive but unable to move away from her assailant. In Dr. Stephens's opinion, these wounds were inflicted for the purpose of causing pain or fear.

Prior to death, Mrs. Stendal had suffered four stretching injuries on the labia and a fifth injury which extended into the opening of the vagina. In the coroner's opinion, four of these probably were caused by a foreign object, and the fifth, probably by a penis. There was no semen inside or on the body.

Also while alive, Mrs. Stendal had received a blunt-force injury to the area of her right kidney. There also were blunt-force injuries to her left foot. The ligatures used to tie her hands were tied so tightly they had cut into her wrists. There were post mortem abrasion injuries attributed to dragging the body.

On April 30, the officers returned to the Stendal residence to perform a systematic investigation. On this occasion, they noticed small amounts of blood on the bedroom nightstand. After dismantling and removing the bed, they found, near the location of the head of the bed, approximately one dozen pamphlets. Some of the pamphlets had blood on them and one appeared to contain a bloody palm print. Other latent palm prints were obtained from the booklets. The blood on some of the pamphlets later was identified as being of the same type as Mrs. Stendal's. The door to the master bedroom on the side facing the den appeared to have been wiped with a damp, dirty rag.

On May 2, Sergeant Jarrett returned to the residence and noticed a cigarette butt from an unfiltered cigarette lying outside a window of the residence; there were also indications a hand had been on the window sill (although no fingerprints could be obtained).

2. *Evidence of defendant's involvement.*

In view of the circumstantial nature of the evidence connecting defendant to the commission of the crimes, and the nature of the defense that was presented at trial, we consider it necessary to set forth in substantial detail

the evidence relating to defendant's activities immediately preceding and following the commission of the murder.

Mrs. Stendal's son David (who was approximately 21 years of age at the time of trial) had lived with Mrs. Stendal until 1979, when he moved to Chico. David had known defendant (20 years of age at the time of trial) and Robert Manley (26 years of age at the time of trial) for several years and often had smoked marijuana with them. David had concealed marijuana in various locations within the Stendal residence until sometime in 1979 or 1980. Manley resided with his mother, Neta Manley, less than one block from the Stendal residence.

From February 18, 1981, to April 9, 1982, defendant was not present in the Burney area. In late January 1982, defendant commenced a four-week general truck-driving course at Western Truck School, where he received instruction in tying knots. Students at the school were taught to tie several types of trucker's knots, which knots were identical to those found on the ligatures used to bind Mrs. Stendal's wrists.

Approximately two weeks prior to the murder of Mrs. Stendal, defendant returned to live with his mother and two brothers in Burney. In the early morning hours of either Friday or Saturday, April 16 or 17, defendant and Robert Manley made four or five obscene or "crank" telephone calls from the Manley residence to various Burney residents. Robert Manley telephoned Mrs. Stendal and told her he would like to have sexual relations with her. Defendant made a separate obscene telephone call to an unnamed person.

On April 21, 1982, defendant hitchhiked to the Manley residence, arriving approximately 2 p.m. Mrs. Manley returned from work at 3 p.m. Prior to 5 p.m., Mrs. Manley drove defendant to a market in Burney to purchase liquor. When they returned to the Manley residence, the three had a drink and then ate dinner at 5 p.m. Approximately 5:30 p.m., defendant and Robert Manley walked to a local convenience store, where Manley purchased two packs of unfiltered Camel cigarettes (the brand and type they both smoked), giving one pack to defendant. They returned to the Manley residence to drink and watch a baseball game on television, and remained there after Mrs. Manley departed at 7 p.m. Defendant had three or four drinks. The baseball game commenced approximately 7:35 p.m. Between 8 p.m. and 8:30 p.m., defendant telephoned his mother to report he was at the Manley residence and intended to remain there for the night.

Approximately 8:30 p.m. defendant departed, informing Robert Manley that he was going to one of the local bars to "pick up" a woman and would

return later to spend the night. When he left, defendant was wearing thongs, white socks, blue jeans, a blue shirt, and a gold-colored windbreaker borrowed from Robert Manley, because defendant did not have his own jacket with him. Shortly after 8:30 p.m., defendant arrived at the residence of his friend Jeffrey Bohall, who lived five to six blocks from the Manley residence and four to five blocks from the Stendal residence. Defendant remained at that location until sometime before 10 p.m., when he departed in order to have a few drinks and "get a piece of butt." Defendant inquired whether Bohall wanted to accompany him but Bohall declined. Bohall's mother, Juanita Bohall, who was home during defendant's visit, testified that defendant was wearing blue jeans and an off-white or cream-colored lightweight jacket with a rust-brown trim. She could not clearly remember his shoes but thought they were lightweight.

When Mrs. Manley returned to her residence between 10:30 p.m. and 11 p.m. that evening, defendant was not present. When Robert Manley retired at 2:30 a.m. after watching the baseball game and a late-night movie, defendant still had not returned. When Mrs. Manley left for work between 5:30 and 6 a.m., defendant was not at the Manley residence. According to defendant's mother, Julia Proctor, defendant did not return to the Proctor residence during the night of April 21.

After sunrise, at 5:30 a.m. on the morning of April 22, defendant's aunt, Sharon Palkki, observed defendant walking across the street in front of Palkki's residence, which was located approximately 500 feet from Mrs. Stendal's residence, several miles from defendant's residence in Johnson Park on the outskirts of Burney. Defendant was wearing loose-fitting blue jeans, white socks, and sandals, and what appeared to be a pair of gloves was dangling from his right pants pocket. Between 6 a.m. and 7 a.m., defendant telephoned his brother, Ed Proctor, instructing him to have their mother give defendant a ride home from the local market. Another witness observed defendant telephoning from that location during the same time period. When defendant's mother picked him up, defendant was wearing blue jeans and a gold-colored windbreaker, which she did not recognize. His mother did not remember the type of footwear defendant was wearing but testified he owned a pair of thongs.

Approximately 11:30 a.m. on April 22, Robert Manley arose and telephoned defendant, who informed Manley that defendant had seen his (defendant's) mother downtown the previous evening and had driven home with her. When Robert Manley asked defendant whether he had watched the baseball game, the late-night movie, or any other television program at home, defendant responded he had not, and stated he was tired and wanted to sleep.

Defendant agreed to meet Robert Manley after doing defendant's laundry. Later that day, Robert Manley and his mother drove to the Proctor residence, where they picked up defendant. They proceeded to Redding in order to purchase tickets to a concert. Defendant returned Robert Manley's jacket at that time, and Manley observed it was cleaner than it had been when he had given it to defendant the previous evening. After being dropped off and obtaining the tickets, Robert Manley and defendant met two women and spent the night with them at a motel in Redding.

On the morning of April 23, Shasta County officers brought defendant and Robert Manley to the sheriff's station for questioning. Defendant told Sergeant Jarrett that he had been at Robert Manley's residence until 8:30 p.m. on April 21 and then had gone into Burney. Defendant stated he had received a ride home that evening from an unidentified man in a pickup truck. At his residence, defendant had sharpened some knives for his mother, and had been home several hours before retiring at 11 p.m. Defendant did not arise until 9 a.m. on April 22, and did not leave the residence until after 3 p.m., when he went to Redding with Robert Manley and spent the night at a motel. Defendant showed Jarrett a motel room receipt, which defendant volunteered he had kept "for an alibi in case anything flared up." Defendant denied having visited Mrs. Stendal's residence.

Defendant was placed in custody for a parole violation he admitted to the officers. One of the officers observed that defendant had suffered abrasions below each knee, and that there were what appeared to be five or six somewhat parallel scratch marks above defendant's right knee. On April 24, Dr. Stephens examined defendant's leg injuries and determined they probably were two days old, and had not been sustained through any layers of clothing but rather while defendant's legs were uncovered. The injuries were similar to injuries Dr. Stephens had observed in other sexual assault cases.

On May 1, Mrs. Proctor visited defendant in custody and afterward informed one of the detectives that her son had asked her to tell Sergeant Jarrett that he had been at home on the night of the murder. When Mrs. Proctor had advised defendant she already had told Jarrett otherwise, defendant asked her to tell Jarrett that defendant had been at a party that evening.

The bloody palm print obtained from one pamphlet proved to match defendant's palm print, and the other, latent palm prints obtained from the booklets also matched defendant's palm prints. A very faint print from footwear was found at the location where the body was discovered and proved to be similar in design to the tread of a pair of thongs recovered from defendant's possession. On May 2, defendant was placed under arrest for the murder of Mrs. Stendal.

## B. *The defense case.*

Defendant had known Robert Manley for several years prior to the murder. He testified he was acquainted with David Stendal, had known Mrs. Stendal approximately three to four years, and had been inside the Stendal residence on twenty or thirty occasions. Defendant testified that Manley and David Stendal had used marijuana and amphetamines on many occasions, and Manley had broken into the Stendal residence on at least two prior occasions. A defense investigator testified that Manley had informed him that one of the entries had been for the purpose of locating drugs.

Defendant testified that, after drinking the previous evening, he had awakened on the Monday or Tuesday morning prior to the day of the murder, with the bruises on his legs which the officers later had noticed. Defendant further testified that on the afternoon of April 21, 1982, he and Manley drank whiskey mixed with cola at the Manley residence. Defendant and Manley wanted to attend a concert in Chico, and Manley began to talk of retrieving various drugs which he knew David Stendal had secreted in the Stendal residence, and which defendant believed Manley intended to sell in order to raise money to purchase the tickets. After having two or three drinks, defendant left the Manley household shortly after 8:30 p.m. and proceeded to Jeffrey Bohall's residence, where he remained until 9:30 or 10 p.m. After Bohall refused to accompany defendant to "party," defendant left on foot to purchase Camel Light, filtered cigarettes (his brand and type) at a liquor store. The walk to the store took him one and one-half hours, and he returned to Manley's residence approximately midnight.

Upon arriving, defendant was unable to locate Manley and retired to an upstairs bedroom. Defendant awoke several hours later, at dawn on April 22. Defendant could not find Manley, but at this time discovered a note addressed to defendant on the side of the dresser, notifying him that Manley had departed to "check Stendal's stash" and would return shortly. Defendant decided to follow Manley to the Stendal residence.

When defendant arrived, the garage door was open but Mrs. Stendal's automobile was not inside the garage. The lights were turned on in the front room, and after no one responded to his knock, defendant entered through the unlocked sliding glass door. Defendant did not locate either Robert Manley or Mrs. Stendal, but noticed a puddle of blood next to the bed that he "just kind of tested" by touching it with the back of his hand. He noticed some pamphlets between the bed and a nightstand but did not recall touching the pamphlets upon which his palm prints later were detected. Defendant immediately ran out the back door to the market, where he telephoned his

mother to ask that she pick him up. At home, defendant slept for several hours and telephoned Robert Manley approximately 1:30 p.m. on April 22. He did not launder his clothing.

After defendant and Manley were dropped off in Redding by Manley's mother, Manley told defendant that the previous evening, Mrs. Stendal had become ill and Manley had driven her to the hospital. Manley could not explain to defendant why there was blood on the floor of the Stendal residence.

The jury found defendant guilty of first degree murder, rape, and burglary, with an enhancement for great bodily injury, and found true the three charged special-circumstance allegations. After the jury could not agree as to penalty, a mistrial was declared. Defendant renewed his motion for change of venue, which was granted, and retrial of the penalty phase was conducted in Sacramento County.

## II. Penalty Phase Evidence

### A. *The prosecution's case.*

The prosecution presented evidence to the Sacramento County jury substantially similar to the evidence presented to the Shasta County jury, including the following: that Mrs. Stendal was last seen alive shortly before 8 p.m. on April 21, 1982; that when she failed to appear the following day for school, a brief search commenced; that the body was discovered on April 22, 1982; and that subsequent forensic examination of the body revealed the injuries described above. The evidence obtained at Mrs. Stendal's residence was presented, as was the testimony of Mrs. Manley and Robert Manley concerning defendant's actions and whereabouts on the evening of the murder. The two witnesses who had observed defendant near the murder scene early on the morning of April 22, 1982, testified. The prosecution presented the evidence of defendant's familiarity with trucker's knots. In addition, the prosecutor and defense counsel stipulated that in 1980 and 1981, defendant had suffered two second degree burglary convictions, and in 1981 also had been convicted of vehicle theft.

### B. *The defense case.*

The defense presented two witnesses. Defendant's brother Ed testified that defendant did not have difficulty getting "dates." At 9 a.m. on April 22, 1982, Ed returned from a trip to find defendant at the Proctor residence. From that time until 12 p.m., defendant helped Ed repair a vehicle. Defendant did not wash his clothes that morning.

Defendant's mother testified that defendant's father left the family in 1981. Defendant had dropped out of high school after his sophomore year. Defendant's mother characterized him as a follower who was easily led. Defendant's mother had not known him to be hostile or disrespectful to women in general, or to say anything derogatory about Mrs. Stendal in particular.

At the conclusion of the penalty phase, the jury fixed the penalty at death.

## DISCUSSION

### I. GUILT PHASE ISSUES

#### A. *Motion for change of venue.*

■ Defendant contends the trial court erred in denying his repeated motions for change of venue.[3] ■ Pursuant to section 1033, subdivision (a), the court must grant a motion for change of venue if "there is a reasonable likelihood that a fair and impartial trial cannot be had in the county." The phrase "reasonable likelihood" in this context "means something less than 'more probable than not,' " and "something more than merely 'possible.' " (*People* v. *Bonin* (1988) 46 Cal.3d 659, 673 [250 Cal.Rptr. 687, 758 P.2d 1217].) In ruling on such a motion, as to which defendant bears the burden of proof, the trial court considers as factors the gravity and nature of the crime, the extent and nature of the publicity, the size and nature of the community, the status of the victim, and the status of the accused. (*People* v. *Edwards* (1991) 54 Cal.3d 787, 807 [1 Cal.Rptr.2d 696, 819 P.2d 436]; *People* v. *Cooper* (1991) 53 Cal.3d 771, 805 [281 Cal.Rptr. 90, 809 P.2d 865]; *People* v. *Bonin, supra,* 46 Cal.3d 659, 672-673.)

■ "On appeal after a judgment following the denial of a change of venue, the defendant must show both that the court erred in denying the change of venue motion, i.e., that at the time of the motion it was reasonably likely that a fair trial could not be had, and that the error was prejudicial, i.e., that it [is] reasonably likely that a fair trial was not *in fact* had. [Citations.]" (*People* v. *Edwards, supra,* 54 Cal.3d 787, 807, italics added; *People* v. *Cooper, supra,* 53 Cal.3d 771, 805-806.)

With regard to the first part of the showing required of a defendant on appeal, we employ a standard of de novo review of the trial court's ultimate

---

[3]After entering a plea of not guilty on August 2, 1982, defendant on September 14, 1982, moved for a change of venue, which motion was denied summarily on September 23, 1982, on the ground the motion did not comply with California Rules of Court, rule 841. On October 8, 1982, defendant filed a second motion to change venue, which the court considered and denied on October 20, 1982. On December 7, 1982, defendant renewed his motion for change of venue, which was heard and denied on that date.

determination of the reasonable likelihood of an unfair trial. (*People* v. *Edwards, supra,* 54 Cal.3d 787, 807; *People* v. *Cooper, supra,* 53 Cal.3d 771, 805-806; *People* v. *Bonin, supra,* 46 Cal.3d 659, 676-677.) This requires our independent determination of the weight of the five controlling factors described above. (*People* v. *Bonin, supra,* 46 Cal.3d 659, 676-677; *People* v. *Balderas* (1985) 41 Cal.3d 144, 177 [222 Cal.Rptr. 184, 711 P.2d 480].) With regard to the second part of the showing, in order to determine whether pretrial publicity had a prejudicial effect on the jury, we also examine the voir dire of the jurors. (*People* v. *Howard* (1992) 1 Cal.4th 1132, 1167 [5 Cal.Rptr.2d 268, 824 P.2d 1315]; *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1131 [240 Cal.Rptr. 585, 742 P.2d 1306]; *People* v. *Balderas, supra,* 41 Cal.3d 144, 177.)

 Although defendant was charged with very serious offenses, every capital case presents a serious charge. This factor adds weight to a motion for change of venue but is not dispositive. (*People* v. *Howard, supra,* 1 Cal.4th 1132, 1167; *People* v. *Cooper, supra,* 53 Cal.3d 771, 806; *People* v. *Balderas, supra,* 41 Cal.3d 144, 177.) The nature of the acts committed upon the victim is a factor that would tend to support a change of venue, but not to the degree of a case involving serial murders, for example. (Compare *People* v. *Jennings* (1991) 53 Cal.3d 334, 360 [279 Cal.Rptr. 780, 807 P.2d 1009].)

Defendant urges that the second factor, the nature and extent of pretrial publicity, virtually compelled a change of venue. In support of his renewed motion, defendant produced copies of articles appearing in two newspapers (six in the Inter-Mountain News, and approximately twenty in the Redding Record Searchlight, between April 1982 and August 1982) and more than sixty copy-notes from local television or radio broadcasts which aired during the same period. Many of these news reports detailed the condition in which Mrs. Stendal's body was found and the circumstances of her death; several included the circumstance that defendant's palm print had been found at the murder scene, and several reported that the prosecutor intended to seek the death penalty because of the heinous nature of the crime.

The defense also produced the results of a telephone public-opinion survey conducted on September 21 and 22, 1982. The survey revealed that of 169 persons contacted, 136 (or 80 percent of those contacted) had heard of the case; 94 (or 55 percent of those contacted) had heard of an arrest having been made; 52 (or 31 percent of those contacted) had formed an opinion as to defendant's guilt, and (of those 52) 38 persons (or 70 percent) had formed their opinion from reading the Record Searchlight and 5 other persons had formed their opinion from reading the Inter-Mountain News.

Defendant urges that the results of the survey compelled a change of venue. The degree of exposure indicated by the survey, however, was not greater than in other cases in which a change of venue has not been required. (See, e.g., *People* v. *Jennings, supra,* 53 Cal.3d 334, 359, 361 [72 percent recalled the offenses and 31 percent believed there was a very strong case against the defendant]; *People* v. *Coleman* (1989) 48 Cal.3d 112, 135 [255 Cal.Rptr. 813, 768 P.2d 32] [46.3 percent recalled the crime and 31.4 percent believed the defendant was probably or definitely guilty].)

An additional consideration is that the impact of the publicity may be mitigated due to the lapse of time between publication or issuance of news reports and commencement of jury selection. (E.g., *People* v. *Jennings, supra,* 53 Cal.3d 334, 361 [publicity eleven months prior to trial did not require change of venue]; *People* v. *Anderson, supra,* 43 Cal.3d 1104, 1130 [danger of prejudice significantly reduced with lapse of five months]; *People* v. *Welch* (1972) 8 Cal.3d 106, 113-114 [104 Cal.Rptr. 217, 501 P.2d 225] [news reports ending just over one month prior to trial did not require venue change].) Passage of time weighs against a change of venue. (*People* v. *Edwards, supra,* 54 Cal.3d 787, 808.)

In the present case, the lapse of nearly three months between the issuance of the last report on August 17, 1982, and the commencement of jury selection on November 10, 1982, helped dispel the potentially prejudicial effect of the news reports of the killing. Although the extent and content of the pretrial publicity indicate a potential for prejudice, the circumstances that the reports had abated in the months preceding the trial, and that trial was held in Redding (35 miles from Burney), a larger community not the locus of the crime, lead us to conclude that a change of venue based upon pretrial publicity was not strongly indicated.

 The next factor to be considered is the size of the community. " 'The larger the local population, the more likely it is that preconceptions about the case have not become imbedded in the public consciousness.' [Citation.]" (*People* v. *Jennings, supra,* 53 Cal.3d 334, 363.) The size of the county by itself is not determinative; rather, the critical factor is whether it can be shown that the size of the population is large enough to neutralize or dilute the impact of adverse publicity. (*Ibid.*)

 Defendant's trial took place in late 1982. Shasta County, which encompasses 3,850.2 square miles (State of Cal., Cal. Statistical Abstract (1984) table A-1, p. 2), then had a population of approximately 122,100, ranking it 28th out of 58 counties in the state (State of Cal., Cal. Statistical Abstract, *supra,* table B-3, p. 15). As defendant has pointed out, cases

involving counties with populations of similar size more frequently have occasioned venue changes than cases involving more populous counties. (See *People* v. *Balderas*, *supra*, 41 Cal.3d 144, 178-179.) We do not agree with the suggestion, however, that every case involving the death penalty merits a change of venue if it arises in a county of this size. Therefore, although this factor weighs somewhat in favor of a change of venue, it is not determinative.

The fourth and fifth factors are the respective status and prominence of the defendant and his victim. In the town of Burney, Mrs. Stendal was a well-known and apparently well-liked active participant in the community, had 20 years' experience in the Burney school system, and was described as having "taught everyone's kids." It does not appear that she had any particular prominence or status in the greater-county area outside the small, isolated town (Burney then had a population of approximately 3,000) in which she lived. Defendant also was a longtime resident of Burney, whose ties to the community were interrupted only by the fairly brief periods he spent at California Youth Authority facilities. Although he previously had been convicted of several nonviolent felony offenses, and news accounts after the murder reported his prior confinement at the California Youth Authority on a burglary commitment, he was by no means a stranger to, or friendless in, the community (see *People* v. *Balderas*, *supra*, 41 Cal.3d 144, 179), and the degree of his prior criminal involvement does not appear to have earned him any great notoriety even in the small community of Burney. Although the respective positions of the victim and defendant within the community might lend support for a change of venue, this factor does not weigh heavily in favor of a change of venue.

Considered in total, the above described factors do not strongly weigh in favor of or against a change, but simply indicate a venue change might have been desirable. It appears that, although he established the possibility of an unfair trial in this venue, defendant failed to carry his burden of proving there was a reasonable likelihood that jurors drawn from Shasta County would have formed such fixed opinions as a result of the pretrial publicity that they could not make the required determinations with impartiality. (See *People* v. *Bonin*, *supra*, 46 Cal.3d 659, 678.)

Considering the relative closeness of the issue, however, we turn next to the question whether any error in the trial court's ruling—that defendant did not carry his burden—would be prejudicial, that is, whether the record demonstrates a reasonable likelihood he did not in fact receive a fair trial. ■ With this purpose in mind, we consider the jury voir dire to determine whether the jurors may have been prejudiced by the pretrial publicity

surrounding the case, bearing in mind that no presumption of a deprivation of due process of law arises from juror exposure to publicity concerning the case. (*People* v. *Daniels* (1991) 52 Cal.3d 815, 853 [802 P.2d 906].)

In *People* v. *Cooper, supra,* 53 Cal.3d 771, prejudice was not shown where only three jurors had been exposed to " 'prejudicial information' " concerning the case and on examination all the jurors had stated they could be fair. (*Id.,* at p. 807.) In *People* v. *Jennings, supra,* 53 Cal.3d 334, prejudice was not established where voir dire of the selected jurors demonstrated they were not "tainted" by the modest pretrial publicity. (*Id.,* at p. 363.) In *People* v. *Bonin, supra,* 46 Cal.3d 659, prejudice was not demonstrated where, even though prior to trial 10 of the 12 jurors and 3 of the 4 alternates had been exposed to news coverage, most had received indirect and minimal exposure. (*Id.,* at p. 678.) In *People* v. *Anderson, supra,* 43 Cal.3d 1104, no prejudice was found where eight of the selected jurors had no knowledge of the facts or the issues, three of the others had read little about the case, one recalled the case in general terms but in none of its details, and each juror stated he or she had formed no opinion and could and would reach a decision based on the evidence presented at trial. (*Id.,* at p. 1131.) In *People* v. *Balderas, supra,* 41 Cal.3d 144, no prejudice was demonstrated where six of the selected jurors professed pretrial ignorance of the case, four recalled reading reports, but none had followed the case or recalled many details. All of the selected jurors stated they could set aside any impressions obtained outside the courtroom and could consider the evidence without being prejudiced by the pretrial publicity. In *People* v. *Welch, supra,* 8 Cal.3d 106, each of the selected jurors was unfamiliar with the facts, had not formed any opinion of the defendant's guilt or innocence, or stated he or she could act fairly and impartially. (*Id.,* at p. 114.)

 In the present case, defendant points out that all but three jurors had watched on television, heard on the radio, or read in the newspapers something concerning the case. Our review of the record reveals, however, that most of those jurors had received only minimal pretrial exposure to the case, that such exposure took place during a period well before commencement of the trial, that the jurors had not been informed of the evidence linking defendant to the case but only that the murder had occurred, and that when questioned on the subject, all of these jurors attested to their ability to put aside everything they had learned about the case and to decide the issues based solely on the evidence presented at trial.

We also observe that, in renewing the motion upon completion of jury selection, defendant did not rely upon the substance of the answers actually given in voir dire to contend the jurors had formed opinions based upon

pretrial publicity; defendant, in fact, acknowledged the assurances of the jurors that they would put aside any prior knowledge of the case. Rather, defendant only reiterated the point made earlier that, based on the percentage of persons answering defendant's telephone poll who indicated they had formed an opinion, it was reasonably likely some of those who actually served on the jury also had formed an opinion, no matter what their responses had been in the voir dire on this subject.

Finally, defendant urges that the circumstance that the trial court granted his motion for a change of venue prior to retrial of the penalty phase suggests the trial court belatedly recognized the true potential for prejudice. The record demonstrates, however, that upon defendant's renewal of his motion at the conclusion of the first trial of the penalty phase, the court expressly granted the motion on the ground that there had been intensive *additional* publicity during the entire guilt and penalty phases of the trial, which the media had attended on a daily basis, and therefore the likelihood of a fair trial in the county had *diminished.*

Having considered the totality of the evidence, we conclude defendant has not met his burden on appeal of demonstrating both that it was reasonably likely he could not receive a fair trial in Shasta County absent a change of venue, and that it was reasonably likely he did not in fact receive a fair trial. Therefore, reversal is not required.

B. *Sufficiency of the evidence.*

1. *First degree murder.*

In support of the allegation of first degree murder, the prosecution proceeded upon three alternate theories: premeditation and deliberation, torture murder, and felony murder (based upon the commission of rape and burglary). According to defendant, his guilt was not proved under any of these theories.

■ Having reviewed the entire record in the light most favorable to the judgment and presuming the existence of every fact the trier of fact reasonably could have deduced from the evidence, we conclude that a rational trier of fact could have found beyond a reasonable doubt the essential elements of defendant's guilt under each of these theories of first degree murder. (*People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1237 [278 Cal.Rptr. 640, 805 P.2d 899]; *People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

a. *Premeditation and deliberation.*

■ In a case, such as the present one, based upon circumstantial evidence, we must decide whether the circumstances reasonably justify the

findings of the trier of fact, but our opinion that the circumstances also might reasonably be reconciled with a contrary finding would not warrant reversal of the judgment. (*People* v. *Perez* (1992) 2 Cal.4th 1117, 1124 [9 Cal.Rptr.2d 577, 831 P.2d 1159].)

In order to ascertain whether the evidence is sufficient to sustain a finding of first degree murder based upon premeditation and deliberation, we generally examine whether there is evidence of planning, motive, or method, although these factors are not exclusive. (*People* v. *Perez, supra,* 2 Cal.4th 1117, 1125; *People* v. *Thomas* (1992) 2 Cal.4th 489, 517 [7 Cal.Rptr.2d 199, 828 P.2d 101]; *People* v. *Raley* (1992) 2 Cal.4th 870, 887 [8 Cal. Rptr 2d 678, 830 P.2d 712]; *People* v. *Edwards, supra,* 54 Cal.3d 787, 813-814.) When the record discloses evidence in all three categories, the verdict generally will be sustained. Otherwise, convictions for first degree murder typically have been upheld where there is " 'either very strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing.' [Citations.]" (*People* v. *Raley, supra,* 2 Cal.4th 870, 887.)

Our review of the record reveals evidence falling within all three categories. With respect to planning, the evidence (the unfiltered cigarette butt found near a window and a handprint on the windowsill) supports an inference defendant spent a period of time just outside Mrs. Stendal's residence observing her, before entering to commit the offenses. Once inside, defendant rendered the victim subject to his complete control by tying her hands and cutting the telephone lines. After binding the victim, defendant had a significant period of time in which to contemplate and plan her eventual death as he engaged in various acts of torture. (See *People* v. *Raley, supra,* 2 Cal.4th 870, 887.)

Although evidence of defendant's motive is less clear, a rational trier of fact could have determined that defendant's motive in murdering Mrs. Stendal was to avoid detection for the sexual and other physical abuses he had committed against her. (See *People* v. *Perez, supra,* 2 Cal.4th 1117, 1126; *People* v. *Raley, supra,* 2 Cal.4th 870, 887; *People* v. *Turner* (1990) 50 Cal.3d 668, 688 [268 Cal.Rptr. 706, 789 P.2d 887].)

Finally, the manner of killing supports a finding of premeditation. The evidence establishes that defendant sequentially strangled the victim—first manually, and then by means of ligature—after subjecting her to prolonged physical abuse through the infliction of various types of wounds, some of which were not random. During the infliction of these wounds, defendant could have quickly dispatched the victim by means of stabbing and beating,

had he chosen to do so. These circumstances do not suggest an unreflecting explosion of violence, but rather a preconceived design to kill the victim by the particular means chosen, and to prolong her agony in the process. (*People* v. *Edwards, supra,* 54 Cal.3d 787, 814; see *People* v. *Raley, supra,* 2 Cal.4th 870, 887.) Therefore, we conclude the evidence, although circumstantial, affords an adequate foundation for an inference of premeditation and deliberation, and is sufficient to support such a conclusion by a rational trier of fact.

### b. *Torture murder.*

The evidence also is sufficient to support the finding that defendant killed the victim with the intent to torture her. " 'Torture murder is "murder committed with a wilful, deliberate and premeditated intent to inflict extreme and prolonged pain." [Citation.]' " (*People* v. *Raley, supra,* 2 Cal.4th 870, 888, quoting *People* v. *Pensinger, supra,* 52 Cal.3d 1210, 1239.) Such intent, considered sufficiently culpable to warrant punishing the perpetrator for first degree murder, is the calculated intent to cause pain for " ' "the purpose of revenge, extortion, persuasion or for any other sadistic purpose." ' " (*People* v. *Raley, supra,* 2 Cal.4th 870, 888, quoting *People* v. *Wiley* (1976) 18 Cal.3d 162, 168 [133 Cal.Rptr. 135, 554 P.2d 881]; see also *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1101 [259 Cal.Rptr. 630, 774 P.2d 659]; *People* v. *Davenport* (1985) 41 Cal.3d 247, 267 [221 Cal.Rptr. 794, 710 P.2d 861].) "However, there must be a causal relationship between the torturous act and death, as Penal Code section 189 defines the crime as murder 'by means of' torture. [Citation.]" (*People* v. *Pensinger, supra,* 52 Cal.3d 1210, 1239, quoting *People* v. *Davenport, supra,* 41 Cal.3d 247, 267.)

Defendant, relying upon the evidence that the numerous "drag" knife wounds across the victim's chest apparently were not inflicted for the purpose of causing death and did not cause death, asserts that no causal relationship exists between these torturous acts and Mrs. Stendal's death. This assertion ignores the additional evidence that her death was caused by manual and ligature strangulation after she not only had been bound, beaten, and stabbed in the manner just described, but also had received a series of additional injuries (described more fully below), inflicted over her entire body. The finding of murder-by-torture encompasses the totality of the brutal acts and the circumstances which led to the victim's death. (*People* v. *Talamantez* (1985) 169 Cal. App.3d 443, 456 [215 Cal.Rptr. 542]; see also *People* v. *St. Joseph* (1990) 226 Cal.App.3d 289, 297 [276 Cal.Rptr. 498]; *People* v. *Hindmarsh* (1986) 185 Cal.App.3d 334, 349 [229 Cal.Rptr. 640].) The acts of torture may not be segregated into their constituent elements in order to determine whether any single act by itself caused the death; rather,

it is the continuum of sadistic violence that constitutes the torture. (*People* v. *Talamantez, supra,* 169 Cal.App.3d at p. 456.)

In the present case, the victim was subjected to strangulation by two different methods, her wrists were bound so tightly as to cut into her skin, she was beaten in the face severely enough to have caused her eyes to be swollen shut and her lips to be swollen, she received severe blows to other parts of her body, and she suffered repeated, incision-type stab wounds to her neck, chest, and breast area. We conclude that this evidence amply supports the finding that Mrs. Stendal's death was brought about by torture.

Defendant additionally contends the trial court erred in instructing the jury pursuant to the then-current version of CALJIC No. 8.24,[4] because the evidence did not establish that the torture caused the victim's death. As explained above, there was ample evidence to demonstrate that the murder was accomplished by means of torture. Thus, the trial court did not err in giving this instruction.

 Although it is in the context of his challenge to the sufficiency of the evidence to support the torture-murder special-circumstance finding that defendant also questions the sufficiency of the evidence to establish the *intent* to torture, for the sake of convenience we review this related claim at this point in our opinion, because intent to torture also must be present in order to sustain a conviction of first degree murder on a theory of torture murder. Again relying exclusively on the evidence of "drag" marks on the victim's chest, defendant urges that the specific intent to torture may not be inferred solely from the condition of the victim's body, because even severe wounds may be as consistent with "an explosion of violence" as with torture. (*People* v. *Mincey* (1992) 2 Cal.4th 408, 432 [6 Cal.Rptr.2d 822, 827 P.2d 388]; *People* v. *Raley, supra,* 2 Cal.4th 870, 888; *People* v. *Davenport, supra,* 41 Cal.3d 247, 268.) Intent is a state of mind which, unless established by the defendant's own statements, must be proved by the circumstances surrounding the commission of the offense (*People* v. *Mincey, supra,* 2 Cal.4th 408, 433; see also *People* v. *Pensinger, supra,* 52 Cal.3d 1210, 1239), which include the severity of the victim's wounds. (*People* v. *Mincey, supra,* 2 Cal.4th 408, 433.)

In the present case, the coroner testified that many of the victim's wounds, particularly the knife "drag" marks, were inflicted while she still was alive

---

[4] The version of CALJIC No. 8.24 (Cal. Jury Instns., Crim. (4th ed. 1979)), as read to the jury, provided in pertinent part: "The essential elements of [torture] murder are one, the act or acts which caused the death must involve a high degree of probability of death, and two, the defendant must commit such act or acts with the intent to cause cruel pain and suffering for the purpose of revenge, extor[t]ion, persua[s]ion or for any sadistic purpose."

but after she had been rendered incapable of avoiding further attack. The wounds revealed that a relatively slow, methodical approach had been employed in their infliction, rather than their having resulted from sudden, explosive violence. The nature of many of the wounds, including the repeated blows to the face and to other parts of the body, as well as the knife "drag" marks, suggests that they were administered over a substantial period of time and that defendant intended to inflict cruel pain and suffering on the victim. Considered with the circumstances that the victim was isolated and prevented from resisting or escaping during these acts, this evidence establishes defendant's intent to torture the victim.

### c. *Felony murder.*

 The evidence also is sufficient to support a finding of first degree murder based upon the theory of felony murder, whether the underlying felony is considered to be rape or burglary. "We have required as part of the felony-murder doctrine that the jury find the perpetrator had the specific intent to commit one of the enumerated felonies, even where that felony is a crime such as rape. [Citations.]" (*People* v. *Hernandez* (1988) 47 Cal.3d 315, 346 [253 Cal.Rptr. 199, 763 P.2d 1289].) It also is established that the killing need not occur in the midst of the commission of the felony, so long as that felony is not merely incidental to, or an afterthought to, the killing. (*Id.*, at p. 348; see *People* v. *Hayes* (1990) 52 Cal.3d 577, 631 [276 Cal.Rptr. 874, 802 P.2d 376].)

 Defendant urges that the only items of evidence linking him to the commission of the rape are the unfiltered cigarette butt found near the residence, his presence in the residence on the night in question, and certain marks on his legs which an expert opined were similar to marks seen on other perpetrators of sexual assaults. Defendant ignores the additional circumstantial evidence that a short time prior to the commission of the present offenses, he participated in making telephone calls of a harassing nature to various persons and was present when his companion made a call of a sexual nature to the murder victim. On the evening the offenses were committed, defendant informed one witness that he was going to pick up a woman, and another that he was going to "get a piece of butt." The evidence that Mrs. Stendal was forcibly raped, prior to her death, was uncontradicted. This evidence, considered with the circumstances that the victim was tied in a manner consistent with defendant's formal education in the art of trucker's knots, that the abrasions below defendant's knees and above his right knee were incurred by defendant while his legs were unclothed, and that these abrasions were consistent with injuries observed in other cases of sexual assault, amply support the jury's implied finding that defendant specifically

intended to commit rape and that the rape was not a mere incident of the murder.

 Defendant also urges there is insufficient evidence to support a finding of felony murder based upon the underlying felony of burglary because there is no evidence demonstrating he entered the residence with the requisite felonious intent (§ 459), in this case the intent to commit rape. Such intent usually must be inferred from all the facts and circumstances revealed by the evidence, because only rarely can it be proved directly. (*People* v. *Matson* (1974) 13 Cal.3d 35, 41 [117 Cal.Rptr. 664, 528 P.2d 752].) In view of (1) the previously described evidence of defendant's conduct in the hours preceding his entry of the Stendal residence, (2) the evidence he spent a period of time immediately outside the residence, presumably contemplating his next act, and (3) the methodical manner in which defendant isolated the victim and committed the rape, the nonsexual physical abuse, and finally the murder itself, it is clear that a rational trier of fact could conclude defendant had the requisite felonious intent prior to his entry into the residence.

C. *Special circumstances issues.*

1. *Torture-murder special circumstance.*[5]

 Defendant contends the trial court erred in failing to instruct the jury that in order to find the special circumstance charged under section 190.2, subdivision (a)(18) (murder involving torture), to be true, it had to determine that defendant possessed the intent to torture Mrs. Stendal. (*People* v. *Davenport, supra,* 41 Cal.3d 247, 271.) The jury in defendant's case was instructed that in order to find the torture-murder special circumstance true, it must be proved: "1. That the murder was intentional, and [¶] 2. That the murder involved the infliction of torture. [¶] To prove the infliction of torture, the infliction of extreme physical pain must be proved no matter how long its duration. [¶] Awareness of pain by the deceased is not a necessary element of torture." (CALJIC No. 8.81.18 (4th ed. 1979).)

Although this instruction did not specifically inform the jury that the concept "infliction of torture" included an "intent to torture," nothing in the instruction was inconsistent with that understanding of the concept. Similarly to the juries in *People* v. *Mincey, supra,* 2 Cal.4th 408, 455, and *People* v. *Wade* (1988) 44 Cal.3d 975, 994 [244 Cal.Rptr. 905, 750 P.2d 794], the

---

[5]As previously noted, we have discussed defendant's attack on the sufficiency of the evidence of the torture-murder special circumstance, specifically that the evidence was insufficient to establish intent to torture, in resolving defendant's related claim that the evidence was insufficient to sustain his conviction of first degree murder on a theory of torture murder. (See *ante,* pp. 530-532.)

present jury was instructed at the guilt phase both as to first degree torture murder and as to the torture-murder special circumstance. The first degree torture murder instruction specifically informed the jury that an "intent to cause cruel pain and suffering" (CALJIC No. 8.24 (4th ed. 1979)) was a required element of the offense. As in *Wade*, "nothing in the present record suggests the jury in this case was likely to have drawn any . . . distinction in the use of the term 'torture' in the two instructions." (44 Cal.3d at p. 994.) Also, as in *Wade*, "neither the prosecutor nor defense counsel suggested at any point that a torture-murder special circumstance could be established without first proving an intent to torture." (*Id.*, at pp. 994-995.)

To be sure, as in *People v. Pensinger, supra,* 52 Cal.3d 1210, 1254-1255, and *People v. Wade, supra,* 44 Cal.App.3d 975, 990, the jury was instructed on multiple theories of first degree murder, and therefore the intent to torture may not be established on the mere basis of the guilt verdict on the first degree murder charge. In *People v. Pensinger, supra,* 52 Cal.3d 1210, we reversed the special circumstance finding because, in addition, neither the prosecutor nor defense counsel discussed the issue whether the defendant had intended to torture the victim, either in the context of the murder-by-torture theory of first degree murder or the torture-murder special circumstance. (*Id.*, at p. 1255.)

In the present case, by contrast, the prosecutor in closing argument repeatedly stressed that defendant's intent was to cause cruel pain. For example, the prosecutor asserted: "He wanted to murder her but he wanted her to die slowly and he wanted her to feel her death." Defense counsel also repeated the instruction on intent to torture. Finally, in rebuttal, the prosecutor reiterated that the prosecution's evidence had demonstrated the intent to torture and also the intent to kill the victim. In further contrast to *People v. Pensinger, supra,* 52 Cal.3d 1210, 1255, there was overwhelming evidence of intent to torture, as described above. In light of the various instructions and the entire trial record, we conclude there is no reasonable likelihood that the jury understood the torture-murder special-circumstance instruction as not requiring a finding of intent to torture. (*People v. Mincey, supra,* 2 Cal.4th 408, 455; see *Estelle v. McGuire* (1991) 502 U.S. __, __ [116 L.Ed.2d 385, 399, 112 S.Ct. 475, 482]; *People v. Kelly* (1992) 1 Cal.4th 495, 525 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

Defendant's claim that the evidence is insufficient to support the finding of a torture-murder special circumstance must be rejected. **(16)** "Proof of a murder committed under the torture-murder special circumstance . . . requires proof of first degree murder (§ 190.2, subd. (a)), proof the defendant intended to kill and to torture the victim (§ 190.2, subd. (a)(18)), and the

infliction of an extremely painful act upon a living victim. (*Ibid.*)" (*People* v. *Davenport supra*, 41 Cal.3d 247, 271.) Unlike the section 189 definition of murder by torture, section 190.2, subdivision (a)(18), requires that the defendant have acted with intent to kill. (41 Cal.3d at p. 271.)

As discussed in detail above, there was ample evidence to support the jury's finding of first degree murder, and to establish that defendant intended to torture his victim, did so while she still was alive, and intended to kill her.

### 2. *Felony-murder special circumstances.*

Defendant contends the trial court erred in failing to instruct the jury that in order to find the special circumstances charged under section 190.2, subdivision (a)(17)(iii) (rape) and (vii) (burglary), to be true, it had to determine that defendant possessed the intent to kill Mrs. Stendal. Subsequent to the trial in this case, such an instruction was required by this court's decision in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 142 [197 Cal.Rptr. 79, 672 P.2d 862]. Defendant also contends that even had the instructions correctly reflected the intent requirement, there is insufficient evidence to support findings of intent, and that these two special circumstance findings therefore must be set aside.

Defendant's claims are rendered moot by this court's intervening decision in *People* v. *Anderson, supra*, 43 Cal.3d 1104, 1147, which expressly overruled *Carlos* on this point. In *Anderson*, we held that "intent to kill is not an element of the felony-murder special circumstance; but when the defendant is an aider and abettor rather than the actual killer, intent must be proved." (*Ibid.*) The rule enunciated in *Anderson* applies both to crimes committed after the *Anderson* decision and to crimes committed prior to the *Carlos* decision. (*People* v. *Hamilton* (1988) 46 Cal.3d 123, 143, fn. 5 [249 Cal.Rptr. 320, 756 P.2d 1348]; *People* v. *Easter* (1987) 197 Cal.App.3d 183, 185-187 [242 Cal.Rptr. 746]; see *People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1182-1183 [270 Cal.Rptr. 286, 791 P.2d 965].) The offenses in this case were committed prior to *Carlos*.

In the present case, the evidence was susceptible of only two reasonable interpretations—that defendant was the actual killer or that he was not at all involved in the crime; there was no evidence he participated only as an aider and abetter. Accordingly, intent to kill was not an element of the felony-murder special circumstances charged against defendant, and the trial court was not required to instruct on such intent as an element of the alleged special circumstances. (*People* v. *Hamilton, supra*, 46 Cal.3d 123, 142-143; *People* v. *Easter, supra*, 197 Cal.App.3d 183, 185.) Although the issue

whether there was sufficient evidence to support a finding that defendant possessed the intent to kill therefore is moot in the context of defendant's present contention, we have concluded (as described above) that the evidence is sufficient to establish defendant's intent to kill.

■■■ In the present case, because defendant was guilty of murder in the perpetration of the rape, the rape-murder special circumstance properly was found to have been proved if it was established that defendant intended to commit rape, and the rape and the killing were part of one continuous transaction. (See *People* v. *Hayes, supra*, 52 Cal.3d 577, 631-632; *People* v. *Hernandez, supra*, 47 Cal.3d 315, 348.) As is amply demonstrated by the evidence, a rational trier of fact could have found that defendant possessed the specific intent to commit rape, and that the rape was not merely incidental to the killing, but part of a continuous course of violence against the victim, culminating in her murder.

The same rule applies with regard to the finding of the burglary-murder special circumstance. (*People* v. *Hayes, supra*, 52 Cal.3d 577, 632; see *People* v. *Hernandez, supra*, 47 Cal.3d 315, 348.) A rational trier of fact properly could have found both that defendant intended to commit burglary, and that the burglary of the residence and the eventual killing were part of one continuous transaction. (See *People* v. *Hayes, supra*, 52 Cal.3d 577, 632.)

D. *Jury deliberations.*

1. *Substitution of a juror.*

The jury retired to deliberate at 3:40 p.m. on December 15, 1982, recessing for the day after less than one hour of deliberations. The following morning, before further deliberations, the court announced that one of the jurors had become ill, and both parties stipulated to his replacement by an alternate juror. After the alternate was sworn, the trial judge advised the jury to resume its deliberations, stating it "would be helpful and in connection with commencing your deliberations again, that you kind of start, start from scratch, so to speak, so that Mr. Rhoades has the benefit of your thinking as well as give him an opportunity for his input also." The jury deliberated two and one-half days after substitution of the alternate juror before returning its verdict.

■■■ Defendant contends the court's admonition did not embody all elements of the instruction required by *People* v. *Collins* (1976) 17 Cal.3d 687 [131 Cal.Rptr. 782, 552 P.2d 742]. In *Collins*, this court directed that

"the court instruct the jury to set aside and disregard all past deliberations and begin deliberating anew. The jury should be further advised that one of its members has been discharged and replaced with an alternate juror as provided by law; that the law grants to the People and to the defendant the right to a verdict reached only after full participation of the 12 jurors who ultimately return a verdict; that this right may only be assured if the jury begins deliberations again from the beginning; and that each remaining original juror must set aside and disregard the earlier deliberations as if they had not been had." (*Id.*, at p. 694; see also *People* v. *Anderson* (1990) 52 Cal.3d 453, 482-483 [276 Cal.Rptr. 356, 801 P.2d 1107].)

Defendant's contention must be rejected. By instructing the jury to "kind of start, start from scratch, so to speak," the court implied that the jury should disregard its previous deliberations. (*People* v. *Odle* (1988) 45 Cal.3d 386, 405 [247 Cal.Rptr. 137, 754 P.2d 184].) By providing this directive in the context of advising the jurors to give the alternate the benefit of the other jurors' thoughts, as well as to give the jurors the benefit of the alternate's input, the court further emphasized that deliberations were to begin anew with the full participation of the alternate. Furthermore, the court did not suggest that the jury might not have to reconsider any matter already considered or decided. (Compare *People* v. *Odle, supra*, 45 Cal.3d 386, 405 [court's comments erroneously implied that the alternate should be brought "up to speed" on matters already discussed and possibly decided].)

Finally, even assuming the court erred, no prejudice occurred. **(20)** In determining whether *Collins* error was prejudicial, we may consider whether the case is a close one and compare the time the jury spent deliberating before and after the substitution of the alternate juror. (*People* v. *Odle, supra*, 45 Cal.3d 386, 405; *Griesel* v. *Dart Industries, Inc.* (1979) 23 Cal.3d 578, 585 [153 Cal.Rptr. 213, 591 P.2d 503].) In *People* v. *Odle, supra*, 45 Cal.3d 386, we concluded there was no prejudice where the case against the defendant was overwhelming and where the jury deliberated only part of one afternoon prior to substitution of the alternate juror and two and one-half days thereafter. (*Id.*, at p. 406.) In *People* v. *Collins, supra*, 17 Cal.3d 687, itself, we determined the error was not prejudicial where the case against the defendant was very strong, and the jury had deliberated little more than one hour prior to substitution of the alternate and had returned a verdict after several additional hours. (*Id.*, at pp. 690, 697.)

In the present case, the evidence against defendant was extremely strong. The jury had deliberated less than one hour prior to substitution of the alternate, and continued to deliberate for two and one-half days thereafter. It is not reasonably probable the outcome of the trial would have been

different had the jury been instructed, in more exact language, to begin its deliberations anew. (See *People* v. *Collins, supra,* 17 Cal.3d 687, 697; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

## 2. *The trial court's comments on the jury's numerical division.*

At 4 p.m. on Thursday, December 16, 1982, the first full day of deliberations, the jury conveyed a message to the court that the jury had reached an impasse and was requesting guidance as to how to proceed. The court, stating it had received the jury's message, requested that the jury foreman inform the court as to the numerical division of the jurors, without revealing the respective numbers for a guilty verdict or a not guilty verdict.[6]

 Defendant contends the court's inquiry into the jury's numerical division impaired the fairness of the trial. "[T]he practice of inquiring into the jury's numerical division, without finding out how many are for conviction and how many for acquittal, was expressly approved in [*People* v.] *Carter* [(1968) 68 Cal.2d 810, 815 (69 Cal.Rptr. 297, 442 P.2d 353)]." (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 776 [230 Cal.Rptr. 667, 726 P.2d 113].) Such inquiry is justified in the discharge of the court's "statutory responsibility of assuring that a verdict is rendered 'unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree.' (Pen. Code, § 1140.)" (*People* v. *Carter* (1968) 68 Cal.2d 810, 815 [69 Cal.Rptr. 297, 442 P.2d 353].)

---

[6]The record of the exchange is as follows:

"THE COURT: All right, we have our jurors back in the box. Mr. Forrester, I received your message as to a numerical count. However, to properly appreciate your message, I'm going to have to ask you a few questions, all right?

"THE FOREMAN: Okay.

"THE COURT: Have the jurors voted on the first count, that would be the issue of murder?

"THE FOREMAN: Uh-huh.

"THE COURT: Without telling me which way that numeral [*sic*] count is, would you tell me what the numerical count is. Don't tell me which way, but what is the numerical count?

"THE FOREMAN: Eleven to one.

"THE COURT: Eleven to one. All right, now, have the jurors taken a vote on the Count II, the rape charge?

"THE FOREMAN: No, we haven't.

"THE COURT: Have the jurors taken a vote as yet on Count III, the burglary charge?

"THE FOREMAN: No, we haven't.

"THE COURT: All right, now in connection with the—well, I think with that information presented to the Court that it would be of importance that if at the moment—well, let me ask you this. Where do you think you are at the moment as far as the numerical count on the eleven to one on the first charge, the count of murder? Do you think that further consideration—

"THE FOREMAN: Yeah, we just—we're kind of at a standstill."

At this point the court, indicating that it was not unusual in a case of this nature for jurors to deliberate longer than a single day, recessed the jury until the following day.

Although, as defendant points out, the rule is otherwise in federal court (see *Brasfield* v. *United States* (1926) 272 U.S. 448 [71 L.Ed. 345, 47 S.Ct. 135]), we previously have explained that this federal rule is not binding on the states. (*People* v. *Rodriguez, supra,* 42 Cal.3d 730, 776, fn. 14.)[7] In view of the circumstance that the court inquired in a neutral manner as to the numerical count in order to determine whether further deliberations would be productive, we decline to disapprove the practice as it was employed in the present case.

We also disagree with defendant's contention that the court's order declaring a recess until the following morning, once it had ascertained the vote was split, implied the court had found "something wrong" with the vote which might be remedied by a night's rest. ▮▮▮ The determination, pursuant to section 1140, whether there is a " 'reasonable probability' " of agreement, rests within the sound discretion of the trial court. (*People* v. *Miller* (1990) 50 Cal.3d 954, 994 [269 Cal.Rptr. 492, 790 P.2d 1289].) Although the court must take care to exercise its power without coercing the jury into abdicating its independent judgment in favor of considerations of compromise and expediency (*ibid.*), the court may direct further deliberations upon its reasonable conclusion that such direction would be perceived " 'as a means of enabling the jurors to enhance their understanding of the case rather than as mere pressure to reach a verdict on the basis of matters already discussed and considered.' [Citation.]" (*Ibid.*) ▮▮▮ Nothing in the trial court's comment in the present case properly may be construed as an attempt to pressure the jury to reach a verdict; the court correctly concluded there was a reasonable probability the jurors could agree on a verdict.

### 3. *The trial court's comments on defendant's testimony.*

The jury continued its deliberations on Friday, December 17, 1982, at one point requesting that the instructions be reread. At 4:20 p.m. that day, the court was informed that one of the jurors sought to disqualify herself on the ground she was "the one," that is, the person not in agreement with the other eleven. After explaining that this circumstance afforded no basis for disqualification, the trial judge commented on the complexity of the case and the relatively brief period the jury had deliberated, reread the instruction as to defendant's entitlement to the individual opinion of each juror, and, noting the lateness of the hour, recessed the deliberations of the jury.

---

[7] In his supplemental brief, defendant urges that we reconsider the California practice permitting such inquiry, but he also acknowledges we have rejected similar requests in other recent cases. (See, e.g., *People* v. *Price* (1991) 1 Cal.4th 324, 467 [3 Cal.Rptr.2d 106, 821 P.2d 610]; *People* v. *Breaux* (1991) 1 Cal.4th 281, 319 [3 Cal.Rptr.2d 81, 821 P.2d 585].) We discern no reason, based upon the circumstances of the present case, to reconsider this issue.

Prior to the resumption of jury deliberations on Monday morning, December 20, the court delivered the following comments:

"Ladies and gentlemen of the jury and the alternates, for the purpose of assisting you in deciding this case, I am permitted by the Constitution of California to comment on the issues, the evidence and the testimony and credibility of any witness. And it occurred to me that before you retired to continue your deliberations this morning that some comment along those lines might be of some assistance to you.

"Now, you should keep in mind that my comments are intended to be advisory only, and are not binding on you, as you are the exclusive judges of the questions of fact submitted to you and of the credibility of the witnesses. You should disregard any or all of the comments, if you do not agree, if they do not agree with your views of the evidence and the credibility of the witnesses."

After outlining the difference between lawful and unlawful killing, the court stated there was no question in this case but that the killing of the victim was unlawful. The court then indicated the issues before the jury were whether the prosecution had proved beyond a reasonable doubt that defendant was legally responsible for the killing, and, if so, in what degree, and, if in the first degree, whether the prosecution had proved the special circumstances. The court also stated the jury must determine whether the prosecutor had proved the rape and burglary charges beyond a reasonable doubt.

The court continued: "Now, in that connection, there have been several statements attributed to the defendant out of court concerning his whereabouts and activities on the night of April the 21st and the early morning hours of April the 22nd. These statements attributed to him are inconsistent with one another and are also inconsistent with his testimony here in court concerning his activities that evening and in the early morning hours of April the 22nd.

"Now, the district attorney has placed him in the house of Bonita Bergh Stendal through three palm prints; one bloody right palm print, which I think Mr. Collins testified to, was created by blood being on the palm first and then transferred to the booklet. In addition to that, Mr. Collins has testified there were two dry palm prints. By that, they were latent, there was a left palm print, which was latent, by that it had a chemical, had to be applied to one of the booklets to raise that palm print to where it could be seen. And another dry palm print of the right palm. Again, one that could only be seen after being treated with chemicals, and that was on a different booklet.

"Now, the defendant has testified and given you an explanation as to what he did in that house that morning which explains the presence of the bloody palm print, but does not explain the presence of the two dry or latent palm prints. Under those circumstances, I have difficulty in believing the testimony of the defendant. Now, again, my comments are intended to be advisory only and are not binding on you as you are the exclusive judges of the questions of fact submitted to you and of the credibility of the witnesses. You should disregard any or all of the comments that I've made if they do not agree with your views of the evidence and the credibility of the witnesses."

The jury then commenced its deliberations for that day. After recessing for lunch and reconvening at 2:55 p.m., it informed the court it had reached a verdict. Prior to the seating of the jury, defendant's counsel stated he had an objection to the court's comments. The court admonished counsel that he should have made his objection earlier.

■ Defendant contends his right to due process of law was violated because he was not apprised in advance of the court's intention to comment, and that the content of the court's comments fell outside the range permitted by our decisions. We do not agree that defendant's right to due process of law was violated by the court's failure to provide advance notice of its intended comments. Although, as pointed out by defendant, the trial court was required by statute to afford advance notice of intended jury instructions, defendant has not directed our attention to any similar statutory or judicial requirement pertaining to judicial comment. In fact, because the statutory provision authorizing judicial comment is contained in the same section as that governing jury instructions (§ 1127; see § 1093, subd. (f)), and the Legislature, while expressly providing that courts are to afford notice of jury instructions (§ 1093.5), has declined to impose such a requirement in the case of judicial comment, we may presume no such requirement was intended by the Legislature as to the latter subject. Defendant relies primarily on *People* v. *Rodriguez, supra,* 42 Cal.3d 730, in which the trial court provided the parties with advance notice of its intended comments, and indeed, numerous drafts of the comments ultimately made in that case were prepared by the prosecutor and discussed at length by court and counsel in advance. (*Id.,* at p. 774, fn. 13.) Although it would be better practice to afford counsel advance notice, we decline defendant's suggestion that we elevate our recitation of the particular procedural aspects of the *Rodriguez* case to the status of a legal requirement.

■ Next, defendant challenges the substance of the trial court's comments. Article VI, section 10, of the California Constitution permits the court

to "make such comment on the evidence and the testimony *and credibility of any witness* as in its opinion is necessary for the proper determination of the cause." (Italics added.) ▪▪▪ The purpose of this provision is to allow the court "to utilize its experience and training in analyzing evidence to assist the jury in reaching a just verdict. [Citations.]" (*People* v. *Cook* (1983) 33 Cal.3d 400, 407 [189 Cal.Rptr. 159, 658 P.2d 86].) In *People* v. *Rodriguez, supra*, 42 Cal.3d 730, 765-770, we overruled that portion of *People* v. *Cook, supra*, 33 Cal.3d 400, 413, which held that a trial court may not make *any* comment on the evidence once the jury has announced it has reached an impasse in deliberations, and concluded that although a trial court may not directly express an opinion on the ultimate issue of guilt or innocence of the accused at any stage of the trial, it is not prohibited from appropriate comment *simply because the jury has indicated an initial deadlock in its deliberations.* (*People* v. *Rodriguez, supra*, 42 Cal.3d at pp. 769-770; see *People* v. *Melton* (1988) 44 Cal.3d 713, 735 [244 Cal.Rptr. 867, 750 P.2d 741].)

In generally summarizing the permissible contours of constitutionally authorized judicial comment, we observed in *People* v. *Rodriguez, supra*, 42 Cal.3d 730, that "the decisions admonish that judicial comment on the evidence must be accurate, temperate, nonargumentative, and scrupulously fair. The trial court may not, in the guise of privileged comment, withdraw material evidence from the jury's consideration, distort the record, expressly or impliedly direct a verdict, or otherwise usurp the jury's ultimate factfinding power. [Citations.]" (*Id.*, at p. 766; *People* v. *Gates* (1987) 43 Cal.3d 1168, 1207 [240 Cal.Rptr. 666, 743 P.2d 301].)

In *People* v. *Rodriguez, supra*, 42 Cal.3d 730, we also noted that a trial court has "broad latitude in fair commentary, so long as it does not effectively control the verdict. For example, it is settled that the court need not confine itself to neutral, bland, and colorless summaries, but *may focus critically on particular evidence*, expressing views about its persuasiveness. [Citations.]" (*Id.*, at 768, italics added.) Therefore, the circumstance that in the present case, the trial court chose to single out for particular emphasis the evidence concerning the presence of defendant's fingerprints at the crime scene, and defendant's inconsistent testimony, did not render its comments improper. As noted in *Rodriguez*, " '[A] judge may restrict his comments to portions of the evidence or to the *credibility of a single witness* and need not sum up all the testimony, both favorable and unfavorable. [Citations.]' " (*Id.*, at p. 773, italics added.)

▪▪▪ In the present case, the trial court essentially observed that defendant had made inconsistent statements concerning his whereabouts during the

pertinent period, and that defendant's testimony as to his presence in the residence, while explaining the presence of the bloody palm print, did not explain the presence of the two dry or latent palm prints, causing the trial court to entertain doubts as to defendant's credibility. The trial court did not inaccurately state or distort any testimony (*People* v. *Rodriguez, supra,* 42 Cal.3d 730, 766, 769; *People* v. *Cook, supra,* 33 Cal.3d 400, 408), and its comment that defendant's testimony "explains the presence of the bloody palm print" permitted an inference more helpful to defendant than the jury might have drawn in the absence of the comment. Although the court commented upon defendant's credibility in a specific context, it did not comment on defendant's guilt or innocence, nor did it direct that the jury reach a given verdict.[8] Moreover, both prior to and after its comments, the court admonished the jury that it was free to disregard those comments. We conclude that the trial court's remarks fell within the scope of the constitutional privilege.

## II. PENALTY PHASE ISSUES

### A. *Alleged prosecutorial misconduct.*

 Defendant asserts the prosecutor committed misconduct in closing argument, when he stated the following: "[C]ircumstantial evidence is the best evidence in the world, if the circumstantial evidence is good enough. [¶] And in this case, of course, we've got the best circumstantial evidence you're ever going to get." Defendant objects to the designation of this evidence as the "best evidence in the world," but acknowledges the jury later was correctly instructed according to CALJIC No. 2.00 (1979 rev.) that: "Both direct evidence and circumstantial evidence are acceptable as a means of proof. Neither is entitled to any greater weight than the other." Any

---

[8]The present case is clearly distinguishable from *People* v. *Flores* (1971) 17 Cal.App.3d 579, 588 [95 Cal.Rptr. 138], in which the appellate court reversed the defendant's conviction for possession of heroin, based upon the trial court's comments on the evidence. In that case, the sole prosecution witness, a police officer, testified he saw the defendant throw away a packet of heroin, and the defendant testified he did not do so. Upon learning that the jury's vote was divided five to seven, the court told the jury that in its opinion it was a very simple, straightforward case, that the court perhaps had heard more evidence than the jury had because the court had "been in this business for some period of time," that it was really a question who was telling the truth, that if the jury believed the officer who testified he saw the defendant throw the packet of heroin away, it must believe the defendant guilty, that defendant's explanation of his behavior in the presence of the officer was not credible, that the defendant had a motive to lie whereas the officer did not, that the defendant had not provided any indication why the officer had a motive to lie, and that the trial court "would not have spent two minutes in deciding this case because I would have decided that the defendant was guilty." (*Id.* at p. 584, fn. 2, italics omitted.)

We believe the comments made by the trial court in the present case do not begin to approach this level of intervention in the jury's decisionmaking.

misapprehension on the part of the jury would have been corrected by this instruction. Furthermore, because defendant did not timely object or request an admonition, any error is deemed waived on appeal. (*People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1077 [5 Cal.Rptr.2d 230, 824 P.2d 1277]; *People* v. *Hendricks* (1988) 44 Cal.3d 635, 650 [244 Cal.Rptr. 181, 749 P.2d 836].) Defendant's claim that the prosecutor's statement constituted an improper expression of his personal belief concerning this evidence must be rejected on the same ground.

■ Defendant next asserts the prosecutor's argument violated the rule in *People* v. *Davenport, supra,* 41 Cal.3d 247, 288-290, by representing that the absence of the following circumstances in mitigation constituted factors in aggravation under section 190.3: any mental or emotional disturbance on the part of defendant (factor (d)), the victim's participation in or consent to the homicidal act (factor (e)), and any circumstances causing defendant reasonably to believe in moral justification for his conduct (factor (f)). Although in *Davenport* we admonished that such argument should not be permitted "in the future" (*id.,* at p. 290), we nevertheless have applied the rule to cases tried, as was the present case, prior to *Davenport*. (*People* v. *Beardslee* (1991) 53 Cal.3d 68, 112 [279 Cal.Rptr. 276, 806 P.2d 1311].)

We observe, as we have in the past, that defendant's failure to object to the challenged remarks precludes a claim of prosecutorial misconduct. (*People* v. *Visciotti* (1992) 2 Cal.4th 1, 79 [5 Cal.Rptr.2d 495, 825 P.2d 388]; *People* v. *Gallego* (1990) 52 Cal.3d 115, 200 [276 Cal.Rptr. 679, 802 P.2d 169]; *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 790.) Even assuming, as defendant has urged in his supplemental brief, that *Davenport* error served to exacerbate so-called "*Brown*" error (*People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440] (revd. on other grounds in *California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]); see discussion, *post*), entitling defendant to review of his claim of error despite his failure to object (*People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1035, fn. 16 [254 Cal.Rptr. 586, 766 P.2d 1]), there is no reasonable possibility the prosecutor's argument could have prejudiced the jury's sentencing decision. First, in view of the instructions on aggravating and mitigating factors described more fully below, there is no reasonable likelihood the jury would have been misled by the prosecutor's comments concerning the nature of the weighing process. (*People* v. *Clair* (1992) 2 Cal.4th 629, 662-663 [7 Cal.Rptr.2d 564, 828 P.2d 705].) Second, the jury was instructed to consider the enumerated factors only "if applicable," allowing the jury to assign whatever weight was appropriate to each particular factor. (*People* v. *Gallego, supra,* 52 Cal.3d 115, 200; *People* v. *Brown* (1988) 46 Cal.3d 432, 454-456 [250 Cal.Rptr. 604, 758 P.2d 1135].) In light of the nature of the

aggravating evidence that properly was introduced, we conclude it is not reasonably possible that any mischaracterization by the prosecutor could have influenced the sentencing decision of a reasonable jury. (*Id.*, at p. 456.)

 Defendant also complains the prosecutor impermissibly offered as a factor in aggravation the nonstatutory ground that defendant showed "absolutely no remorse."[9] Where a prosecutor does not suggest that a defendant's lack of remorse should be considered a factor in aggravation, he or she properly may comment on the lack of remorse. (*People* v. *Gallego, supra*, 52 Cal.3d 115, 197; *People* v. *Carrera* (1989) 49 Cal.3d 291, 339 [261 Cal.Rptr. 348, 777 P.2d 121]; see *People* v. *Sully* (1991) 53 Cal.3d 1195, 1249 [283 Cal.Rptr. 144, 812 P.2d 163].)

The record discloses that defendant's objection to the prosecutor's remark was sustained. The trial court denied defense counsel's request for an additional curative instruction on the basis that the prosecutor had not claimed defendant's lack of remorse was a factor in aggravation, the court explaining it had sustained the objection because the statement constituted a conclusion.

We conclude the trial court was correct in ruling that the prosecutor had not cited lack of remorse as a factor in aggravation, although the court did err in sustaining the defense's objection that the prosecutor's statement expressed an impermissible conclusion. Thus, the trial court did not commit error in refusing defendant's request for an additional instruction or admonition.

 Finally, defendant urges that the prosecutor committed prejudicial misconduct by erroneously claiming that the evidence of defendant's past demonstrated that he "is a violent person."[10] Defendant's failure to object and request a curative instruction or admonition waives any claim he might

---

[9]The prosecutor's comment in context is as follows: "And let me suggest that in this case, there is no basis for sympathy for William Proctor. This is what he does on April 21st, 1982. That's what he does on April 21st. On April 22nd, what's he do? He shows absolutely no remorse." After the court sustained the defense objection, the prosecutor continued: "What does he do on the 22nd? He goes about his business like nothing happened. He goes to Redding. He goes with Bob Manley. And they go there for the purpose of having fun. [¶] The defendant spent April 22nd, 1982, having fun, less than twenty-four hours after he did that, and I submit there is no basis for sympathy for William Proctor in this case."

[10]After canvassing the factors supporting imposition of the death penalty, the prosecutor commented: "Now, I submit that there is nothing that has been presented to you that would extenuate this crime. There is nothing about the defendant's background that you heard that would extenuate this crime. [¶] According to his aunt, he was a normal, average boy growing up, and his mother said that, essentially, as I recall. The only thing you know about his background is that he's had a little history of burglary, takes things that don't belong to him,

have on appeal. (*People* v. *Sully*, *supra*, 53 Cal.3d 1195, 1248; *People* v. *Rodriguez*, *supra*, 42 Cal.3d 730, 790.)

Nonetheless, assuming defendant timely had objected, we reject defendant's claim on the merits. We conclude that the prosecutor's remark was justifiable based on the extreme violence displayed by defendant in committing the present offenses. The prosecutor earlier had informed the jury that the circumstance of defendant's lack of any history of violence was a factor in mitigation. Although the prosecutor made the comment regarding defendant's being a violent person while discussing his background, it is apparent from the context of the entirety of the prosecutor's remarks that he was referring to defendant's conduct in the present case in characterizing defendant as a "violent person."

### B. *Instructional Error.*

#### 1. *Instruction on aggravating and mitigating factors.*

■■■ Defendant contends the court's instruction of the jury pursuant to CALJIC former No. 8.84.2 (4th ed. 1979 rev.)[11] violated his Eighth Amendment right under the federal Constitution to a constitutionally reliable determination of penalty, because the instruction may have confused the jury concerning the nature of the process of weighing aggravating and mitigating circumstances.

In *People* v. *Brown*, *supra*, 40 Cal.3d 512, we upheld the constitutionality of section 190.3, while acknowledging that an instruction incorporating the mandatory language of the section "might mislead jurors as to the scope of their sentencing discretion and responsibility." (*People* v. *Bonin*, *supra*, 46 Cal.3d 659, 706; *People* v. *Hamilton* (1988) 45 Cal.3d 351, 370 [247 Cal.Rptr. 31, 753 P.2d 1109].) We expressed concern that a jury reasonably

---

and he is a violent person. That's what you know about his background. To me, that is not extenuating circumstances."

[11]The court gave the 1979 revised version of CALJIC former No. 8.84.2, as follows: "[I]t is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed upon the defendant. [¶] After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account, and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without possibility of parole. [¶] Before you may consider a particular aggravating circumstance to be true, you must be satisfied of the existence of that aggravating circumstance beyond a reasonable doubt."

might understand the language of the instruction to define the determination of penalty as " 'simply a finding of facts' " or " 'a mere mechanical counting of factors on each side of the imaginary "scale." ' " (*Ibid.*) We also expressed concern that the jury reasonably might understand the instruction to require imposition of the death penalty if the factors in aggravation outweigh those in mitigation, even where that punishment does not appear appropriate in view of all the circumstances of the case. (*People* v. *Hamilton, supra,* 45 Cal.3d at pp. 370-371; *People* v. *Brown, supra,* 40 Cal.3d at pp. 540-544.) For those cases predating *Brown* (such as the present case), in which the jury was instructed in the language of section 190.3, we advised we would review each appeal on its particular merits to determine whether the jury might have been misled to the defendant's prejudice. (*People* v. *Hamilton, supra,* 45 Cal.3d 351, 371; *People* v. *Brown, supra,* 40 Cal.3d at p. 544, fn. 17.)

In the present case, with regard to the first concern expressed in *Brown, supra,* 40 Cal.3d 512, we observe that the jury was instructed, according to defendant's request, as follows: "In considering, taking into account, and being guided by the aggravating and mitigating circumstances, you may not decide the effect of such circumstances by the simple process of counting the number of circumstances on each side. The particular weight of such opposing circumstances is not determined by the relative number, but rather by their relative convincing force on the ultimate question of punishment." Moreover, neither the prosecutor nor defense counsel suggested the jury simply should count the factors. (See *People* v. *Webster* (1991) 54 Cal.3d 411, 451-452 [285 Cal.Rptr. 31, 814 P.2d 1273]; *People* v. *Howard* (1988) 44 Cal.3d 375, 435-436 [243 Cal.Rptr. 842, 749 P.2d 279]; *People* v. *Myers* (1987) 43 Cal.3d 250, 275 [233 Cal.Rptr. 264, 729 P.2d 698].) Accordingly, we conclude the jury was not misled into mechanically counting the aggravating and mitigating factors.

With regard to the second concern described in *Brown, supra,* 40 Cal.3d 512, defendant asserts the jury was misled because, during voir dire, the prosecutor obtained assurances from the prospective jurors that they would not have difficulty in discharging their responsibility to impose the death penalty in the event the aggravating circumstances outweighed those in mitigation, and because, during closing argument, the prosecutor emphasized the language of section 190.3. After repeating the mandatory language of the statute, the prosecutor stated: "So if you conclude that the aggravating circumstances outweigh the mitigating circumstances, you are obligated to return a verdict of death. [¶] And we spent a considerable amount of time on voir dire on this issue, and you indicated that if that was the case, that would be your verdict." In concluding his argument, the prosecutor commented that the jury had "an important, awesome responsibility," and asked them to

return a death verdict "not because you want to but because under the law of California it's necessary. Thank you."

In numerous cases we have found such remarks to be harmless. For example, we have concluded that a prosecutor's argument is not misleading simply because it restates the statutory language (e.g., *People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1181 [259 Cal.Rptr. 701, 774 P.2d 730]), describes the statutory language as mandatory (e.g., *People* v. *Adcox* (1988) 47 Cal.3d 207, 267 [253 Cal.Rptr. 55, 763 P.2d 906] [prosecutor emphasized the word "shall" and advised the jury that "you haven't any choice"]; *People* v. *Hendricks, supra,* 44 Cal.3d 635, 653-655, 662 [prosecutor emphasized the word "shall," describing it as a "term of command" with a compulsory meaning, and the process as an "automatic" one]; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1279 [232 Cal.Rptr. 849, 729 P.2d 115] [prosecutor argued: " '. . . *Shall, not may, not might, not maybe. It is very explicit.* . . .' "]), or emphasizes that the jury's decision is dictated by the law. (E.g., *People* v. *Burton* (1989) 48 Cal.3d 843, 870 [258 Cal.Rptr. 184, 771 P.2d 1270]; *People* v. *Grant* (1988) 45 Cal.3d 829, 857 [248 Cal.Rptr. 444, 755 P.2d 894].)

Moreover, in concluding, the prosecutor emphasized that the jurors had an "important, awesome responsibility." (See *People* v. *Burton, supra,* 48 Cal.3d 843, 871.) This is not a case, such as *People* v. *Milner* (1988) 45 Cal.3d 227 [246 Cal.Rptr. 713, 753 P.2d 669], in which the prosecutor "assured the jurors again and again that they did not have to 'shoulder the burden of personal responsibility,' told them again and again that the law 'protects' them from deciding what is 'just and right,' and even encouraged them to 'hide' behind the law." (*Id.,* at p. 257; see *People* v. *Burton, supra,* 48 Cal.3d 843, 872.) Nor did the prosecutor admonish the jury that the law, rather than the jury, determined the issue whether the defendant should suffer life imprisonment or death. (Cf. *People* v. *Farmer* (1989) 47 Cal.3d 888, 928 [254 Cal.Rptr. 508, 765 P.2d 940].) Furthermore, taken as a whole, the prosecutor's statements concerning the mandatory aspect of section 190.3 were a minor part of his closing argument. (See *People* v. *Kaurish* (1990) 52 Cal.3d 648, 715 [276 Cal.Rptr. 788, 802 P.2d 278].)

The instructions given in this case also implied that the jury's decision as to penalty was not to be automatic or mechanical. The jury twice was informed it had the duty to decide which of the two possible punishments should be imposed, was advised to consider the evidence, the arguments of counsel, and the aggravating and mitigating factors "if applicable," and was told that if a factor was not found to be mitigating, that circumstance did not render it an aggravating factor unless the jury determined it to be aggravating beyond a reasonable doubt. At defendant's request, the jury was instructed that it was obligated to weigh the sympathetic elements of defendant's background against those which might offend the conscience, and in so

doing, it could consider pity, sympathy, and mercy for defendant, but that it could not be governed by conjecture, prejudice, or public opinion. The jury also was instructed that defendant and the prosecution were entitled to the individual opinion of each juror.

Finally, the comments of defense counsel underscored the jury's discretion to decide which penalty was appropriate under the circumstances: counsel advised the jurors that each of them had an independent, singular responsibility to determine the punishment, that it was not a democratic or community effort, and that each would have to live with the verdict. Defense counsel told the jurors to consider and weigh the factors, as they felt appropriate. (See *People* v. *Grant, supra,* 45 Cal.3d 829, 856-857; *People* v. *Williams* (1988) 44 Cal.3d 1127, 1149 [245 Cal. Rptr 635, 751 P.2d 901].) Moreover, defense counsel stressed that the most important factor, a factor in mitigation, was the absence of any violence in defendant's past, thereby underscoring the jurors' duty to consider the factors individually.

From the arguments both of the prosecutor and defense counsel, and from the instructions, the jurors would have understood that they were required to determine the appropriate penalty for defendant by weighing the enumerated factors. (*People* v. *Burton, supra,* 48 Cal.3d 843, 873.) Viewing the instructions and arguments as a whole, we are satisfied there is no reasonable likelihood that the jury was misled as to the scope of its sentencing responsibility. (*People* v. *Clair, supra,* 2 Cal.4th 629, 662-663.)[12]

## 2. *Instruction on consideration of multiple special circumstances.*

Defendant contends the trial court failed to give an instruction on multiple special circumstances as required by our decision in *People* v. *Harris* (1984) 36 Cal.3d 36 [201 Cal.Rptr. 782, 679 P.2d 433]. In *Harris,* the plurality opinion stated that in a case where "overlapping" special circumstances are found to be true, the risk arises that a jury may give undue weight to the mere number of special circumstances found true. "To avoid that risk, in those cases involving a single act or an indivisible course of conduct with one principal criminal objective, the jury should be instructed that although it found several special circumstances to be true, for purposes of determining the penalty to be imposed, the multiple special circumstances should be considered as one." (*Id.,* at p. 66, plur. opn. by Broussard, J.)

---

[12]In light of this conclusion, we need not, and do not, address the continuing validity of *People* v. *Brown, supra,* 40 Cal.3d 512, in light of the United States Supreme Court's decisions in *Blystone* v. *Pennsylvania* (1990) 494 U.S. 299 [108 L.Ed.2d 255, 110 S.Ct. 1078] and *Boyde* v. *California* (1990) 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 1190]. (*People* v. *Webster, supra,* 54 Cal.3d 411, 452, fn. 23; *People* v. *Cooper, supra,* 53 Cal.3d 771, 845, fn. 15; *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1231, fn. 30 [275 Cal.Rptr. 729, 800 P.2d 1159].)

A majority of this court subsequently held to the contrary in *People* v. *Melton, supra,* 44 Cal.3d 713, 765-768. In *Melton* we concluded that it is constitutionally legitimate for the state to determine that a death-eligible murderer is more culpable, and thus more deserving of death, if, as in the *Melton* case, he not only robbed the victim but committed burglary in order to facilitate commission of the robbery and murder, because these offenses involve violations of distinct interests, each of which is relevant to a determination of the seriousness of the crime. (*Id.*, at p. 767.) The decision in *Melton* has been applied in subsequent cases to reject similar claims based upon *Harris.* (E.g., *People* v. *Mickey* (1991) 54 Cal.3d 612, 691-692 [286 Cal.Rptr. 801, 818 P.2d 84]; *People* v. *Sanders* (1990) 51 Cal.3d 471, 529 [273 Cal.Rptr. 537, 797 P.2d 561]; *People* v. *Hernandez, supra,* 47 Cal.3d 315, 357-358.) Accordingly, we reject defendant's contention.

In his supplemental brief, defendant contends that *Melton* also requires that the jury receive instruction that the acts providing the bases for the special circumstances (rape and burglary) may not each be weighed more than once in the penalty determination, that is, both under the circumstances of the crime and as special circumstances (pursuant to section 190.3, factor (a), and the instruction patterned thereon). (*People* v. *Melton, supra,* 44 Cal.3d 713, 768.) Although defendant urges that the trial court has a sua sponte duty to so instruct, we have indicated only that upon defendant's request such an instruction should be given. (*People* v. *Ashmus* (1991) 54 Cal.3d 932, 997 [2 Cal.Rptr.2d 112, 820 P.2d 214]; *People* v. *Morris* (1991) 53 Cal.3d 152, 224 [279 Cal.Rptr. 720, 807 P.2d 949]; *People* v. *Melton, supra,* 44 Cal.3d 713, 768.)

Moreover, we have observed that in the absence of any misleading argument by the prosecutor or an event demonstrating the substantial likelihood of "double-counting," reversal is not required. (*People* v. *Morris, supra,* 53 Cal.3d 152, 224; *People* v. *Melton, supra,* 44 Cal.3d 713, 768-769.) In the present case, the prosecutor did not suggest the offenses other than murder be considered dually as special circumstances and as acts making the murder more heinous; he simply underscored the facts showing the brutality of the acts.

C. *Constitutionality of section 190.3, factor (a).*

 Defendant challenges the constitutionality of the portion of section 190.3 that provides: "In determining the penalty, the trier of fact shall take into account . . . [as] relevant: [¶] (a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be true . . . ." Defendant contends the phrase, "the circumstances of the crime," is too vague to permit

any meaningful distinction between those murders that warrant the death penalty and those that do not.

The United States Supreme Court itself has established that the circumstances surrounding a capital offense constitute one of the criteria upon which the jury *should* base its penalty determination. (See, e.g., *Penry* v. *Lynaugh* (1989) 492 U.S. 302, 318 [106 L.Ed.2d 256, 277-278, 109 S.Ct. 2934]; *Booth* v. *Maryland* (1987) 482 U.S. 496, 502 [96 L.Ed.2d 440, 448, 107 S.Ct. 2529], overruled on other grounds in *Payne* v. *Tennessee* (1991) __ U.S. __ [115 L.Ed.2d 720, 111 S.Ct. 2597]; *Jurek* v. *Texas* (1976) 428 U.S. 262, 274 [49 L.Ed.2d 929, 939-940, 96 S.Ct. 2950] (plur. opn.).) The high court has not stated or implied that the factor of the "circumstances of the offense" is unconstitutionally vague.

Defendant also contends section 190.3 is unconstitutional as applied to him because, unlike the typical case where the same jury decides both issues of guilt and penalty, his case afforded the jurors only one opportunity to express their outrage at the offenses—by assigning the degree of punishment—and therefore the jury was more prone to set the maximum penalty. Nothing in the evidence, the arguments of counsel, or the instructions supports this assertion. Furthermore, because it was defendant who requested the change of venue and, by definition, the new jury, he is not in a position to claim prejudice from the granting of his motion. We also note that defendant has provided no authority for the proposition that, when a new penalty jury has been impaneled, the state may not permit the jury to determine the appropriate punishment on the basis of the same criteria that would have applied had a single jury determined both issues of guilt and penalty. Defendant has not provided any basis for us to conclude section 190.3 is unconstitutional.

D. *Denial of the automatic application for modification of the verdict.*

Defendant contends the court erred in denying the automatic motion to modify the verdict pursuant to section 190.4, subdivision (e). ▉ Under that section, the trial judge's "function is not to make an independent and de novo penalty determination, but rather to independently reweigh the evidence of aggravating and mitigating circumstances and then to determine whether, in the judge's independent judgment, *the weight of the evidence supports the jury's verdict.* [Citations.]" (*People* v. *Lang* (1989) 49 Cal.3d 991, 1045 [264 Cal.Rptr. 386, 782 P.2d 627], italics in original; *People* v. *Edwards, supra,* 54 Cal.3d 787, 846.) The trial judge must set forth his or her reasons with sufficient particularity to allow effective appellate review. (54 Cal.3d at p. 846; *People* v. *Kelly* (1990) 51 Cal.3d 931, 970 [275 Cal.Rptr. 160, 800 P.2d 516].)

1. *The circumstances of the crime.*

■ Relying upon *People* v. *Rodriguez, supra,* 42 Cal.3d 730, defendant contends the trial court did not adequately specify its reasons for determining that section 190.3, factor (a) (the circumstances of the crime), amounted to an aggravating factor. In that case, we held the court's statement of reasons for denying the motion, as a whole, was insufficient "to assure thoughtful and effective appellate review," where the trial court simply stated that, having considered the arguments of counsel, all the evidence, and all the aggravating and mitigating circumstances, the aggravating factors outweighed those in mitigation and the weight of the evidence supported the jury's verdict of death. (*Id.,* at pp. 792-794.)

In the present case, the trial court's comments, in considering the section 190.3 factors generally and factor (a) in particular, were far more extensive and detailed. In explaining its ruling denying the automatic motion, the court commented that it had reviewed the evidence, considered the aggravating and mitigating factors, and made a determination whether the jury's verdict (that the aggravating circumstances outweighed the mitigating circumstances) was contrary to law or to the evidence. Following defense counsel's argument that the offenses committed in the present case were not sufficiently grievous to justify the death penalty, the court stated it had examined and carefully reviewed the testimony presented and had found that the jury's verdict was supported by the weight of the evidence and that defendant was guilty beyond a reasonable doubt.

The court then considered each section 190.3 factor in turn, devoting the greatest amount of time to factor (a), the circumstances of the crime. The court summarized the evidence, emphasizing that the telephone lines in the kitchen and the den had been cut, and that the victim had been raped, beaten, stabbed, and intentionally tortured by defendant. The court described in detail the condition of the body and recounted the expert testimony concerning the nature of the victim's injuries and defendant's purpose in inflicting them. The court also noted that defendant had transported the victim's body to another location.

The trial court's discourse on section 190.3, factor (a), was sufficiently detailed and thorough to justify the determination made by the court. It is readily apparent the court provided far more elaboration than did the trial court in *Rodriguez, supra,* 42 Cal.3d 730, and defendant does not indicate what additional elements he believes the court should have considered in deciding whether the circumstances of the capital offense constituted a factor in aggravation. We conclude the court adequately stated its reasons for

determining that the circumstances of the crime constituted an aggravating factor.

### 2. Defendant's role in the crime.

■ Section 190.3, factor (j), specifies that among the matters to be considered by the trier of fact in determining the penalty is "[w]hether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor." Defendant contends that, because the evidence merely established the inapplicability of factor (j), it was improper for the trial court to consider, as a factor in aggravation, the circumstance that defendant acted alone.

We have indicated or implied in numerous prior decisions that factor (j) may be considered only as a mitigating factor, and that where the defendant is not an accomplice whose participation in the offense is relatively minor, the factor is simply inapplicable and should not be considered as aggravating. (*People* v. *Daniels, supra,* 52 Cal.3d 815, 889; *People* v. *Gallego, supra,* 52 Cal.3d 115, 200; *People* v. *Gonzalez, supra,* 51 Cal.3d 1179, 1233-1234; *People* v. *Hamilton, supra,* 48 Cal.3d 1142, 1184; *People* v. *Burton, supra,* 48 Cal.3d 843, 865; *People* v. *Walker* (1988) 47 Cal.3d 605, 643-644 [253 Cal.Rptr. 863, 765 P.2d 70]; *People* v. *Hernandez, supra,* 47 Cal.3d 315, 363-364; *People* v. *Adcox, supra,* 47 Cal.3d 207, 273; *People* v. *Moore* (1988) 47 Cal.3d 63, 92 & fn. 13 [252 Cal.Rptr. 494, 762 P.2d 1218]; *People* v. *Karis* (1988) 46 Cal.3d 612, 652 [250 Cal.Rptr. 659, 758 P.2d 1189]; *People* v. *Brown, supra,* 46 Cal.3d 432, 455-456 & fn. 10; *People* v. *Siripongs* (1988) 45 Cal.3d 548, 582-583 [247 Cal.Rptr. 729, 754 P.2d 1306]; see *People* v. *Davenport, supra,* 41 Cal.3d 247, 288-290.) Nonetheless, in *People* v. *Howard, supra,* 1 Cal.4th 1132, 1195, we approved the trial court's treatment of evidence of that defendant's sole participation as aggravating under factor (j). We need not decide the issue raised by the apparent conflict among these decisions, because any error in the present case would not have been prejudicial.

The People indicate that the failing, if any, in the trial court's consideration (under section 190.3, factor (j)) of the evidence that defendant had acted alone, consists in the court's already having considered defendant's singular and active role in the offense when the court reviewed the circumstances of the offense under section 190.3, factor (a). In his reply brief, defendant contends that the trial court did, in fact, err in this regard.

Our review of the record reveals, however, that at no time during the court's discourse on the circumstances of the offense did it emphasize, or

even mention, that defendant had acted alone. That the court reviewed defendant's *commission* of the offense (and the nature of that offense) does not lead to the conclusion that the court considered defendant's exclusive participation in the acts as a circumstance in aggravation under section 190.3, factor (a). Aside from the court's consideration, under section 190.3, factor (j), of defendant's role in the offense, the only other reference by the court to the circumstance that defendant acted alone was made in the context of its review of section 190.3, factor (g), addressing whether defendant had acted under extreme duress or under the domination of another person. In the latter part of its review, the court simply noted that, because defendant had acted alone, factor (g) was inapplicable. The court did not consider twice the evidence that defendant had acted alone in conceiving and carrying out the offense, and therefore, any error in considering this circumstance under factor (j) was harmless. (*People* v. *Burton, supra,* 48 Cal.3d 843, 865; *People* v. *Adcox, supra,* 47 Cal.3d 207, 273.)

### 3. *Defendant's age and prior felony convictions.*

 Defendant next asserts the trial court erred in determining that, although defendant's age (twenty years, three and one-half months at the time of the offense) "could be a mitigating factor," the circumstances that defendant had been convicted of three prior felonies, had violated probation in March 1981, and was on parole at the time he committed the present offense, rendered defendant's age neither a mitigating nor an aggravating factor.

Depending upon the circumstances of the crime, age properly can be considered either as a mitigating or an aggravating factor. (*People* v. *Mitcham, supra,* 1 Cal.4th 1027, 1076; *People* v. *Edwards, supra,* 54 Cal.3d 787, 844.) It functions " 'as a metonym for any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty.' " (*People* v. *Mitcham, supra,* 1 Cal.4th 1027, 1076.)

Therefore, in the present case the trial court was not obligated to treat defendant's age as a factor in mitigation. Moreover, we believe that although the court expressed itself somewhat imprecisely, in essence it weighed the two factors of defendant's age and his prior felony convictions in concluding, in light of defendant's prior record, that the circumstance that he was between 20 and 21 years of age at the time he committed the present offense was not entitled to much weight. The court properly weighed these factors in

assessing whether the penalty was appropriate. (See, e.g., *People* v. *Hamilton, supra*, 48 Cal.3d at pp. 1186-1187.)[13]

### 4. *Consideration of other extenuating circumstances.*

 Defendant contends that the court inadequately stated its reasons for concluding no mitigating circumstances were present under section 190.3, factor (k),[14] and that the court's statement did not indicate it had assessed the credibility of the witnesses, determined the probative force of the testimony, and weighed the evidence.

As described above, the court reiterated that it had evaluated all the evidence and expressly considered the evidence or absence of evidence relating to each successive factor, examining carefully the evidence in mitigation. After expressing its views as to the applicability of section 190.3, factor (k), the court stated: "As required by law, the Court has considered all the evidence adduced at the penalty phase of the trial and has been guided by the aforesaid factors, and having heard and considered the arguments of counsel, the Court concludes and finds that the aggravating circumstances do in fact outweigh the mitigating circumstances and therefore the jury's finding is supported by the evidence." The court stated that, in its independent review of all the evidence, it found the jury's verdict was not contrary to the law or the evidence.

The trial court's comments make clear that it fully understood its obligation to assess the credibility of the witnesses, determine the probative force of the testimony, and weigh the evidence, including all information pertaining to defendant and applicable under section 190.3, factor (k). We conclude the statement of reasons given by the trial court for its determination pursuant to factor (k) was adequate.

We also reject the contention, raised in defendant's reply brief, that the court, in referring to its finding that the jury's verdict was not contrary to the

---

[13]Because the trial court did not consider any "invalid aggravating factor" (including any aggravating factor not supported by substantial evidence) in denying the motion under section 190.4, subdivision (e), *Sochor* v. *Florida* (1992) 504 U.S. __, __ [119 L.Ed.2d 326, 337-340, 112 S.Ct. 2114, 2120-2123], cited in defendant's supplemental brief, has no application to the present case.

[14]The court stated: "[T]he final factor is, quote, any other circumstances which extenuate the gravity of the crime, even though it is not a legal excuse for the crime, including but not limited to the defendant's character, background, history, mental condition and physical condition, end quote. [¶] The evidence adduced at the penalty phase of the trial causes the court to find that there are no circumstances which extenuate the gravity of the crimes which you committed and for which you have been convicted. Therefore, the Court finds that this factor constitutes neither a mitigating nor an aggravating factor."

law or the evidence, demonstrated that it misconstrued its task in reviewing the evidence independently under section 190.4. The statements made by the court reveal that it accurately perceived its duty to reweigh independently the evidence of aggravating and mitigating circumstances and then determine whether, in its independent judgment, the weight of the evidence supported the jury's verdict. (§ 190.4, subd. (e); *People* v. *Edwards, supra,* 54 Cal.3d 787, 846; *People* v. *Lang, supra,* 49 Cal.3d 991, 1045.) In view of the numerous instances in which the trial court reiterated that it independently had reviewed the evidence, and the particularity with which the court reviewed the evidence, we conclude the court properly understood and performed the obligation imposed upon it by section 190.4, subdivision (e).

III. CONCLUSION

The judgment is affirmed in its entirety.

Lucas, C. J., Panelli, J., Arabian, J., and Baxter, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—I concur in the judgment. I write separately to emphasize that the authority of trial courts to comment on the evidence is subject to strict limitations and must be exercised with extreme caution, and to express my view that, consistent with this court's well-established case law, factor (j) of Penal Code section 190.3 cannot be an aggravating circumstance.

I.

Our Constitution (Cal. Const., art. VI, § 10), as well as our statutes (Pen. Code, §§ 1093, subd. (f), 1127), grant trial courts the authority to comment on the testimony and credibility of witnesses. But there is a countervailing consideration. The Constitutions of both the United States (U.S. Const., Amend. VI) and the State of California (Cal. Const., art. I, § 16) also grant a criminal defendant the right to a jury trial, and that right requires that the jury be the exclusive arbiter of questions of fact and the credibility of witnesses. (See e.g., *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 766 [230 Cal.Rptr. 667, 726 P.2d 113]; *People* v. *Friend* (1958) 50 Cal.2d 570, 577-578 [327 P.2d 97]; *People* v. *Ottey* (1936) 5 Cal.2d 714, 728 [56 P.2d 193].)

There is an inherent tension between the authority of a trial court to comment on the evidence and the right of a criminal defendant to a jury trial. A court's exercise of its authority to comment on the evidence always poses the danger of a violation of the right to jury trial. Because a judge presiding

over a trial necessarily has substantial influence on the jury (*Bollenbach* v. *United States* (1946) 326 U.S. 607, 612 [90 L.Ed. 350, 354, 66 S.Ct. 402]), every judicial comment on the evidence carries with it an appreciable risk that the jury may discount its own view of the evidence in deference to the judge's opinion. (*People* v. *Cook* (1983) 33 Cal.3d 400, 407 [189 Cal.Rptr. 159, 658 P.2d 86].) Therefore, in the interest of protecting the right to jury trial while giving efficacy to our state Constitution's grant of authority to comment on the evidence, appellate courts have imposed strict limitations on the trial court's authority to comment.

Thus, a trial court's comments on the evidence must be "necessary for a proper determination of the cause." (Cal. Const., art. VI, § 10.) They must assist, not coerce, the jury. (*People* v. *Rodriguez, supra*, 42 Cal.3d at pp. 767-768.) The court must inform the jurors that they are the exclusive judges of all questions of fact and of the credibility of witnesses. (Pen. Code, § 1127; *People* v. *Brock* (1967) 66 Cal.2d 645, 651 [58 Cal.Rptr. 321, 426 P.2d 889].) The comments must be made with a view to protecting the rights of the defendant. (*People* v. *Brock, supra*, 66 Cal.2d at p. 650.) They must be accurate, temperate, scrupulously fair, and made with wisdom and restraint. (*People* v. *Cook, supra*, 33 Cal.3d at p. 408.) The comments may not (1) be argumentative (*ibid.*); (2) distort the law or the record (*People* v. *Brock, supra*, 66 Cal.2d at p. 650; *People* v. *Friend, supra*, 50 Cal.2d at p. 577); (3) withdraw evidence from the jury's consideration (*People* v. *Brock, supra*, at p. 650); (4) expressly or impliedly direct a verdict (*People* v. *Cook, supra*, 33 Cal.3d at p. 408; *People* v. *Brock, supra*, 66 Cal.2d at p. 650); or (5) express a view on the ultimate issue of guilt or innocence (*People* v. *Melton* (1988) 44 Cal.3d 713, 735 [244 Cal.Rptr. 867, 750 P.2d 741]).

In this case, the trial court's comments came perilously close, but did not cross, the line between permissible jury assistance and prohibited coercion. The court made its remarks without notice to counsel and after it was aware that the jury had deadlocked 11 to 1. The comments, however, were accurate and did not distort the record. Immediately before and after the comments, the court reminded the jury that it was the exclusive arbiter of questions of fact and the credibility of the witnesses, and that it was free to disregard any or all of the trial court's comments. The jury then continued its deliberations for approximately four hours. (Compare *People* v. *Cook, supra*, 33 Cal.3d at p. 406 [jury returned verdict 14 minutes after trial court's comments].)

On balance, giving consideration to all of the circumstances in which the trial court's comments were made (*People* v. *Melton, supra*, 44 Cal.3d at p. 735) in the context of the existing state of the law (see *People* v. *Rodriguez, supra*, 42 Cal.3d at pp. 765-770), I agree with the majority's conclusion that

the trial court's comments were within the scope of its authority under article VI, section 10 of the state Constitution. I emphasize, however, that a trial court's option to comment on the evidence should be exercised, if at all, only with great caution.

## II.

As a result of numerous decisions of this court in recent years, it is now well established that the circumstance described in factor (j) of Penal Code section 190.3 (hereafter factor (j)) can only be mitigating. Yet the majority now treats this issue as unresolved (see maj. opn., *ante*, p. 553), even though it was resolved years ago. In so doing, the majority injects a harmful and entirely needless uncertainty into the center of our death penalty law.

Factor (j) directs the jury in the penalty phase of a capital case to consider "[w]hether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor" in deciding whether to impose the death penalty. Thus, if the defendant is an accomplice whose role in the offense was relatively minor, the jurors must consider this fact as a circumstance in mitigation, although they are free to give it whatever weight they deem appropriate. If these conditions are not satisfied, factor (j) is inapplicable, as the defendant's conduct in this regard is not "*more* serious than 'normal' " for a person who has been convicted of murder with special circumstances. (*People* v. *Daniels* (1991) 52 Cal.3d 815, 889 [277 Cal.Rptr. 122, 802 P.2d 906]; *People* v. *Burton* (1989) 48 Cal.3d 843, 864-865 [258 Cal.Rptr. 184, 771 P.2d 1270]; *People* v. *Adcox* (1988) 47 Cal.3d 207, 273 [253 Cal.Rptr. 55, 763 P.2d 906]; *People* v. *Siripongs* (1988) 45 Cal.3d 548, 583 [247 Cal.Rptr. 729, 754 P.2d 1306]; see also *People* v. *Davenport* (1985) 41 Cal.3d 247, 289-290 [221 Cal.Rptr. 794, 710 P.2d 861].)

When, as here, the defendant is the sole perpetrator of the murder, factor (j) does not apply, as this court has held on numerous occasions. (*People* v. *Daniels*, *supra*, 52 Cal.3d at p. 889; *People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1184 [259 Cal.Rptr. 701, 774 P.2d 730]; *People* v. *Hernandez* (1988) 47 Cal.3d 315, 364 [253 Cal.Rptr. 199, 763 P.2d 1289]; *People* v. *Karis* (1988) 46 Cal.3d 612, 652 [250 Cal.Rptr. 659, 758 P.2d 1189]; *People* v. *Brown* (1988) 46 Cal.3d 432, 455-456 & fn. 10 [250 Cal.Rptr. 604, 758 P.2d 1135]; *People* v. *Siripongs*, *supra*, 45 Cal.3d at p. 583; see also *People* v. *Gallego* (1990) 52 Cal.3d 115, 200 [276 Cal.Rptr. 679, 802 P.2d 169]; *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1233-12349 [275 Cal.Rptr. 729, 800 P.2d 1159]; *People* v. *Burton*, *supra*, 48 Cal.3d at pp. 864-865; *People* v. *Adcox*, *supra*, 47 Cal.3d at p. 273; *People* v. *Walker* (1988) 47 Cal.3d 605,

643-644 [253 Cal.Rptr. 863, 765 P.2d 70]; *People* v. *Moore* (1988) 47 Cal.3d 63, 92 & fn. 13 [252 Cal.Rptr. 494, 762 P.2d 1218].)

The majority puts in doubt the continuing validity of all these cases by asserting that they are now in "apparent conflict" with *People* v. *Howard* (1992) 1 Cal.4th 1132, 1195 [5 Cal.Rptr.2d 268, 824 P.2d 1315]. But the opinion in *Howard* provided no reasoning or analysis to support the one sentence in that opinion that is arguably inconsistent with this otherwise unbroken line of authority, nor did it discuss or even acknowledge any of the contrary decisions listed above. The suggestion in *Howard* that factor (j) can be aggravating carries no persuasive force and should therefore be disapproved.

In *People* v. *Hernandez, supra*, 47 Cal.3d 315, 364, this court said that because the defendant in that case was the sole perpetrator of the murders, factor (j) "obviously did not apply . . . ." What was obvious to a unanimous court in *Hernandez* has become obscure to the current majority, and for no good reason. The mandate of this court is to settle important questions of law (Cal. Rules of Court, rule 29(a)), not to unsettle them. I decline to join the majority in unsettling the proper meaning and scope of factor (j).

**MOSK, J.**—I dissent.

In my view, the court committed reversible error by commenting as it did on the evidence and defendant's credibility.

I

Trial on the question of guilt or innocence was conducted in late 1982 in rural Shasta County. It was charged that, on April 21 or 22 of that year, defendant burglarized the residence of Bonita Bergh Stendal in the small mountain community of Burney and there proceeded to rape and murder the woman; it was alleged that he intentionally inflicted great bodily injury on Stendal in the course of the burglary and the rape, and that he murdered her under the special circumstances of felony-murder-burglary, felony-murder-rape, and torture murder.

Between December 8 and 14, the People presented evidence to establish defendant's guilt. Included were three palm prints at Stendal's residence: a bloody and visible print from defendant's right hand, and two dry and latent prints, one from his right hand, the other from his left. Also offered were various extrajudicial statements he had made relating to his activities and whereabouts on April 21 and 22.

On December 14, defendant presented evidence. He took the stand to deny involvement in the crimes and to attempt to explain his palm prints and extrajudicial statements. He sought to exculpate himself and to inculpate his friend Robert Manley.

On December 15, the prosecutor and defense counsel delivered their summations. The prosecutor's position was, of course, that defendant was guilty. He argued, in part, as follows: Stendal had been murdered; someone was obviously responsible; that someone was defendant; his palm prints placed him in the Stendal residence; true, he gave exculpatory testimony about his activities and whereabouts on April 21 and 22, within the house and without; his statements on the stand, however, did not explain the palm prints and were inconsistent with his statements out of court, which in turn were inconsistent with each other; as a result, his exculpatory testimony lacked credibility. Defense counsel's position was to the contrary. His argument included an attempt to counter practically all the prosecutor's points.

Also on December 15, the jury was instructed on the murder, rape, and burglary charges and the special circumstance and great-bodily-injury allegations. The panel then commenced its deliberations and spent less than an hour at the task. The court recessed the proceedings for the day.

On December 16, at morning's opening, the court effectively instructed the jury to begin its deliberations anew after it substituted an alternate juror in place of one of the original members, whom, as it stated, it had discharged on stipulation because of a sudden illness. The panel deliberated about four and one-quarter hours. The foreman then reported to the court that the jurors were at an impasse and requested direction on how to proceed. The court asked whether the panel had voted on murder. The foreman said yes. The court asked for the numerical count without disclosure of the position as to guilt or innocence. The foreman said 11 to 1. The court asked whether the panel had voted on rape. The foreman said no. The court posed the same question about burglary. The foreman gave the same answer. The court then informed the jurors that they faced a situation that was not unusual, and might need more time to make their determinations. It recessed the proceedings for the day.

On December 17, the jury deliberated about two and one-half or three and one-half hours. At the foreman's request, the court reread the instructions to the panel. The jury deliberated about one and one-half hours more.

Late that afternoon, the foreman sent the court a note that Juror Mae Lois Turner—who was evidently the only Black person on the panel—"would like to disqualify self. Would like to be replaced by alternate."

In open court, in the presence of the other members of the panel, Juror Turner confirmed the report. The court asked, "Why is it you wish to disqualify yourself?" She answered, "Because I'm the one," "I'm the one who is—there is eleven to one. I'm the one." The court stated, "That would not be—that's not justification for disqualification. If you have some problem—" She interjected, "I don't have any problem, Judge," and explained, "I have my opinion and I don't want to be—I don't want to be pressured into doing something, and they have their opinion, and I have mine." The court responded, "Well, that's fine. There is no problem with that, so long as you're discussing the evidence." One of the jurors remarked, "Everybody is getting tired with one another."

Addressing all the jurors, the court stated that the case was complicated and relatively little time had been spent in deliberations. It reread the instruction that both the People and defendant were entitled to the individual opinion of each juror. It also reminded the jurors that they were under a duty to proceed conscientiously, and expressed its belief that they were doing so. It then noted the lateness of the hour. It determined that the panel had not voted on any of the charges or allegations other than murder. It recessed the proceedings until December 20.

On December 20, without notice to the People or defendant and before deliberations resumed, the court made a comment to the jurors and alternate jurors concerning the evidence and defendant's credibility. It opened with a statement that its words were intended to be "advisory only" and were "not binding." It then proceeded: there was no question that the killing of Stendal was murder; rather, the basic question was whether defendant was the murderer; his palm prints placed him in the Stendal residence; true, he gave exculpatory testimony about his activities and whereabouts on April 21 and 22, within the house and without; his statements on the stand, however, did not explain the palm prints and were inconsistent with his statements out of court, which in turn were inconsistent with each other; as a result, his exculpatory testimony lacked credibility. It closed by repeating its statement that its words were intended to be "advisory only" and were "not binding."[1] The jury then deliberated about three and one-half or four and one-half hours. It returned guilty verdicts on each of the charges and true findings on each of the allegations.

---

[1]"Ladies and gentlemen of the jury and the alternates, for the purpose of assisting you in deciding this case, I am permitted by the [C]onstitution of California to comment on the issues, the evidence and the testimony and credibility of any witness. And it occurred to me that before you retired to continue your deliberations this morning that some comment along those lines might be of some assistance to you.

"Now, you should keep in mind that my comments are intended to be advisory only, and are not binding on you, as you are the exclusive judges of the questions of fact submitted to you and of the credibility of the witnesses. You should disregard any or all of the comments,

## II

Article VI, section 10 of the California Constitution (hereafter article VI, section 10) declares in relevant part that "The court may make such comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause."

---

if you do not agree, if they do not agree with your views of the evidence and the credibility of the witnesses.

"Now, under California law, by definition, the word 'homicide' means the killing of one human being by another, either lawfully or unlawfully. Now, under the instructions that I've given you, the word homicide includes murder. And I've given you in that connection instructions on first degree murder as well as instructions on second degree murder. There is the word homicide, however, also means the lawful killing of another—of a person by another. And that's in situations where the act occurs as a result of some excusable or justifiable—under the law—reason for killing. In this particular case, we do not have a justifiable or lawful killing of a human being by another. There shouldn't be any doubt in anyone's mind that the death, the killing of Bonita Bergh Stendal was an unlawful killing of her by another person. There is absolutely no evidence whatsoever that she was killed in self defense or any other type of reason or that she killed herself. There shouldn't be any doubt in anyone's mind on the facts that have been presented in this case, that we have an unlawful killing of Ms. Stendal by another person.

"Now, the real question in this case is whether the State, the district attorney, has proved beyond a reasonable doubt that the defendant is legally responsible for the killing. That's basically the issue here, as well as if the State has proved beyond a reasonable doubt that the defendant is legally responsible for the killing, have they proved beyond a reasonable doubt that it's murder in the first degree or murder in the second degree. And if they've proved beyond a reasonable doubt that it's murder in the first degree, you go on to whether they proved beyond a reasonable doubt any one or more of the special circumstances that have been mentioned. And you are also called upon to determine as to whether they've proved beyond a reasonable doubt that the defendant committed the rape, whether they proved beyond a reasonable doubt the defendant committed a burglary.

"Now, in that connection, there have been several statements attributed to the defendant out of court concerning his whereabouts and activities on the night of April the 21st and the early morning hours of April the 22nd. These statements attributed to him are inconsistent with one another and are also inconsistent with his testimony here in court concerning his activities that evening and in the early morning hours of April the 22nd.

"Now, the district attorney has placed him in the house of Bonita Bergh Stendal through three palm prints; one bloody right palm print . . . was created by blood being on the palm first and then transferred . . . . In addition to that, . . . there were two dry palm prints. By that, they were latent, there was a left palm print, which was latent . . . . And another dry palm print of the right palm. . . .

"Now, the defendant has testified and given you an explanation as to what he did in that house that morning which explains the presence of the bloody palm print, but does not explain the presence of the two dry or latent palm prints. Under those circumstances, I have difficulty in believing the testimony of the defendant. Now, again, my comments are intended to be advisory only and are not binding on you as you are the exclusive judges of the questions of fact submitted to you and of the credibility of the witnesses. You should disregard any or all of the comments that I've made if they do not agree with your views of the evidence and the credibility of the witnesses."

The purpose of the provision is to allow the trial judge to use his "training in analyzing testimony" and "experience in determining the credibility of witnesses" "to assist the jurors in determining what evidence has a bearing on the disputed issues in the case and to aid them in weighing the evidence . . . ." (*People* v. *Brock* (1967) 66 Cal.2d 645, 650 [58 Cal.Rptr. 321, 426 P.2d 889], "overruled" on a point not implicated herein, *People* v. *Cook* (1983) 33 Cal.3d 400, 413, fn. 13 [189 Cal.Rptr. 159, 658 P.2d 86], overruled in turn on a point not implicated herein, *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 770 [230 Cal.Rptr. 667, 726 P.2d 113].)

The provision, of course, is subject to the criminal defendant's right to trial by jury under both the United States and California Constitutions. The Sixth Amendment to the federal charter, as made applicable to the states by the due process clause of the Fourteenth Amendment, declares that "In all criminal prosecutions, the accused shall enjoy the right to a . . . trial[] by an impartial jury . . . ." Article I, section 16 of the state charter provides that "Trial by jury is an inviolate right and shall be secured to all . . . ."

Under article VI, section 10, a court has broad power in delivering a comment. (E.g., *People* v. *Rodriguez, supra,* 42 Cal.3d at p. 766.) But that power is not unlimited. (E.g., *People* v. *Brock, supra,* 66 Cal.2d at p. 650.) As noted, the constitutional authority has been given to *judges* for the purpose of assisting *jurors.* A judge must, of course, cleave fast to the judicial role and not adopt that of an advocate. (See, e.g., *People* v. *Friend* (1958) 50 Cal.2d 570, 577 [327 P.2d 97] [construing former § 19 of art. VI of Cal. Const., which was the predecessor of present § 10 of art. VI of Cal. Const., and was virtually identical in relevant part thereto], "overruled" on a point not implicated herein, *People* v. *Cook, supra,* 33 Cal.3d at p. 413, fn. 13.) Also, any remarks he may make must further, and not frustrate, the defendant's "right to independent jury determination of the facts bearing on his guilt or innocence." (*People* v. *Rodriguez, supra,* at p. 766.) Accordingly, he may not state or suggest his own views on guilt or innocence. (*People* v. *Cook, supra,* at pp. 412-413; see *People* v. *Rodriguez, supra,* at p. 770.) To do so would "necessarily interfere[] with the jurors' ability to freely perform their fact-finding responsibility." (*People* v. *Cook, supra,* at p. 413.)

Not only is the court's power to comment broad, it is also "most potent." (*People* v. *Robinson* (1946) 73 Cal.App.2d 233, 237 [166 P.2d 17] [construing former § 19 of art. VI of Cal. Const.].) " 'The influence of the trial judge on the jury is necessarily and properly of great weight,' [citation], and jurors are ever watchful of the words that fall from him." (*Bollenbach* v. *United States* (1946) 326 U.S. 607, 612 [90 L.Ed. 350, 354, 66 S.Ct. 402].) "The point need not be labored that the members of the jury are apt to give great

weight to any hint from the judge as to his opinion on the weight of the evidence or the credibility of the witnesses . . . ." (*People* v. *Robinson, supra,* at p. 237.) Accordingly, the court must exercise its power "with great care" (*People* v. *Rincon-Pineda* (1975) 14 Cal.3d 864, 886 [123 Cal.Rptr. 119, 538 P.2d 247, 92 A.L.R.3d 845]) and "with wisdom and restraint" (*People* v. *Shannon* (1968) 260 Cal.App.2d 320, 331 [67 Cal.Rptr. 207]), "lest [it invade] the province of the jury as trier of fact" (*People* v. *Rincon-Pineda, supra,* at p. 886) or indeed "control the verdicts" (*People* v. *Brock, supra,* 66 Cal.2d at p. 650).

It follows that, even if it proceeds ever so cautiously, a court passes beyond the bounds of what is permitted under article VI, section 10 when its comment "hinders rather than helps the jury to perform its duty in properly considering the case." (*People* v. *Oliver* (1975) 46 Cal.App.3d 747, 753 [120 Cal.Rptr. 368].) Such a situation is present, for example, where the remark "provides for the jury a means to avoid the preliminary determinations called for by the instructions on the law and instead to rely on the words of the judge in returning a conviction." (*People* v. *Brock, supra,* 66 Cal.2d at p. 651.) A court also exceeds the permissible by making what is "tantamount to an argument to convict" (*People* v. *Flores* (1971) 17 Cal.App.3d 579, 588 [95 Cal.Rptr. 138]) and—a fortiori—by stating or suggesting its own views on guilt or innocence (*People* v. *Cook, supra,* 33 Cal.3d at pp. 412-413).

### III

Applying the foregoing principles to the facts of record, I conclude that the court committed reversible error by commenting as it did on the evidence and defendant's credibility.

Error is manifest.

To begin with, the court did not proceed "with great care" (*People* v. *Rincon-Pineda, supra,* 14 Cal.3d at p. 886) or "with wisdom and restraint" (*People* v. *Shannon, supra,* 260 Cal.App.2d at p. 331). Indeed, its intervention was altogether precipitous. Almost three full days had passed since the jury had last deliberated. Comment was premature before the jurors had returned to their task and expressed some difficulty. It was also imprudent without notice to the People and defendant.

More troubling, the court's comment was "tantamount to an argument to convict" (*People* v. *Flores, supra,* 17 Cal.App.3d at p. 588) and indeed suggested that the court itself believed defendant was guilty, and could only have "hinder[ed] rather than help[ed] the jury to perform its duty in properly considering the case" (*People* v. *Oliver, supra,* 46 Cal.App.3d at p. 753).

Recall that part of the prosecutor's summation and the substance of the court's comment were to the same effect: Stendal had been murdered; defendant's palm prints placed him in her residence; true, he gave exculpatory testimony about his activities and whereabouts on April 21 and 22, within the house and without; his statements on the stand, however, did not explain the palm prints and were inconsistent with his statements out of court, which in turn were inconsistent with each other; as a result, his exculpatory testimony lacked credibility.

It is plain that the jury would have heard the court's comment as tantamount to an argument for conviction. How could it not? The substance of the comment was the same as part of the prosecutor's summation: it added nothing and it subtracted nothing. The prosecutor's summation was, literally, an argument for conviction. The court's comment effectively approved and adopted what was urged therein. From all that appears on the face of record, the court did not deliver the words in the passionate manner evidently employed by the prosecutor. But it delivered them nonetheless.

It is also plain that the jury would have heard the court's comment to suggest that the court itself believed defendant was guilty. Again, how could it not? Innocence depended on the credibility of defendant's exculpatory testimony. The court expressed its own view on the question in no uncertain terms: ". . . I have difficulty in believing the testimony of the defendant."

It follows that the court's comment could only have hindered the jury in the proper consideration of the case. The remark allowed the panel "to rely on the words of the judge in returning a conviction" and so "avoid the preliminary determinations called for by the instructions on the law" (*People* v. *Brock, supra*, 66 Cal.2d at p. 651)—determinations it clearly found difficult.

To be sure, the court told the jurors that its comment was intended to be "advisory only" and was "not binding." Such an incidental statement, however, is "insufficient to neutralize" the improper remark's "potent effect." (*People* v. *Cook, supra*, 33 Cal.3d at p. 410, fn. 9.)

The majority's discussion is generally unobjectionable so far as it goes. But it simply does not go far enough. It fails to discern that the court's comment was tantamount to an argument for conviction and, as such, could only have hindered the jury in the proper consideration of the case. That the trial judge's words were not identical to those in other cases is obvious—and unimportant.

I now turn from the fact of error to its consequences. "Particularly in a criminal trial," such as this, "the judge's last word is apt to be the decisive

word." (*Bollenbach* v. *United States, supra,* 326 U.S. at p. 612 [80 L.Ed. at p. 354].) The court's erroneous comment was its final remark. Evidently, it was dispositive. About four hours thereafter, the jury returned guilty verdicts on *all* the charges and true findings on *all* the allegations—even though it had been unable to agree on *any* verdict or finding in the approximately nine hours that preceded. Accordingly, I am "of the opinion that the error . . . has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.)[2]

IV

In passing, I make the following observations.

First, contrary to the majority's implication, I believe that a challenge, based on *Stringer* v. *Black* (1992) 503 U.S. __ [117 L.Ed.2d 367, 112 S.Ct. 1130] (*Stringer*), to the standard jury instruction on the determination of penalty would surely prove substantial.

In *Stringer,* the United States Supreme Court held that "if a State uses aggravating factors in deciding who shall be eligible for the death penalty or who shall receive the death penalty, it cannot use factors which as a practical matter fail to guide the sentencer's discretion" in contravention of the Eighth Amendment. (503 U.S. at p. __ [117 L.Ed.2d at pp. 381-382, 112 S.Ct. at p. 1139].) It explained: "Although our precedents do not require the use of aggravating factors, they have not permitted a State in which aggravating factors are decisive to use factors of vague or imprecise content. A vague aggravating factor employed for the purpose of determining whether a defendant is eligible for the death penalty fails to channel the sentencer's discretion. A vague aggravating factor used in the weighing process is in a sense worse, for it creates the risk that the jury will treat the defendant as more deserving of the death penalty than he might otherwise be by relying upon the existence of an illusory circumstance." (*Id.* at p. __ [117 L.Ed.2d at pp. 381-382, 112 S.Ct. at p. 1139].) Of course, California uses "aggravating factors"—labeled "special circumstances" (Pen. Code, § 190.2, subd. (a))—to determine death eligibility. It also uses "aggravating factors"— bearing that very label (*id.,* § 190.3)—to decide between life and death.

A narrow *Stringer* challenge could specifically attack any one or more of the factors set out in the standard jury instruction on the determination of penalty as vague and, for that reason, likely to invite an arbitrary and

---

[2]Because of the result I reach, I need not and do not consider whether the court's erroneous comment effectively denied defendant his right to trial by jury under either the Sixth Amendment to the United States Constitution or article I, section 16 of the California Constitution or both.

capricious choice of punishment in violation of the Eighth Amendment. Defendant raises such a claim against factor (a), which covers "[t]he circumstances of the crime." The majority dismiss the point. I am dubious. That "[t]he United States Supreme Court itself has established that the circumstances surrounding a capital offense constitute one of the criteria upon which the jury *should* base its penalty determination" (maj. opn., *ante*, at p. 551, italics in original) is of no consequence. What is dispositive is not what jurists on appellate courts may announce, but what laypersons on juries may understand.

A broader *Stringer* challenge could generally attack the standard jury instruction on the determination of penalty as vague at its very core and, for that reason, highly likely to invite an arbitrary and capricious choice of punishment in violation of the Eighth Amendment. Certainly, the instruction raises more questions than it answers. For example, on what does the determination of penalty turn? What do the terms "aggravation" and "mitigation" mean? Which of the factors are potentially aggravating and/or mitigating? (See *People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 152-154 [2 Cal.Rptr.2d 335, 820 P.2d 559] (conc. opn. of Mosk, J.), vacated and remanded *sub nom. Bacigalupo* v. *California* (1992) 506 U.S. ___ [121 L.Ed.2d 5, 113 S.Ct. 32], for further consideration in light of *Stringer* v. *Black, supra,* 503 U.S. ___ [117 L.Ed.2d 367, 112 S.Ct. 1130].)

Second, factor (j)—"[w]hether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor"—is potentially mitigating and not potentially aggravating. " '[A]ggravation' means that which increases the defendant's personal moral culpability above the level of blameworthiness that inheres in the capital offense. By contrast, 'mitigation' means that which reduces his culpability below that level." (*People* v. *Bacigalupo, supra,* 1 Cal.4th at p. 153 (conc. opn. of Mosk, J.).) Numerous decisions of this court by many of its members establish the fact that factor (j) is potentially mitigating only. In her concurring and dissenting opinion herein, Justice Kennard proves the point beyond peradventure. Reason also establishes the fact. The question posed in factor (j) calls for one of two answers. A determination that the defendant was, in actuality, a minor accomplice may lead to the conclusion that his culpability was less than that generally reflected by commission of the offense. But a determination that he did *not* play such a role simply does not lead to the conclusion that his culpability was greater. Loose and uncertain dictum arguably to the contrary, which appears in a single opinion that does not cite any authority or present any analysis, should be disapproved forthwith. It should not be used, as by the majority, to "create" a "conflict" where none exists.

## V

Because the court committed reversible error by commenting as it did on the evidence and defendant's credibility, I would reverse the judgment.

Appellant's petition for a rehearing was denied March 10, 1993. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.